**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| **CATHERINE WARE**, on behalf of herself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>**CLEANCHOICE ENERGY, INC.**<br><br>Defendant. | Civil Case No.:<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

# TABLE OF CONTENTS


**NATURE OF THE CASE** .......... 1

**PARTIES** .......... 6

**JURISDICTION AND VENUE** .......... 6

I. Subject Matter Jurisdiction .......... 6

II. Personal Jurisdiction .......... 6

III. Venue .......... 7

**FACTUAL ALLEGATIONS** .......... 7

I. The History Of Deregulation And ESCOs' Role In Electricity Markets .......... 7

II. Plaintiff's Dealings With CleanChoice .......... 9

III. CleanChoice's Variable Rates Are Much Higher Than Benchmark Local Utility Rates, Even When Accounting For RECs. .......... 14

IV. CleanChoice's Variable Rates Are Much Higher Than Its Costs To Procure Electricity In The Wholesale Market, Even When Accounting For RECs .......... 21

V. CleanChoice's Fixed Rates Prove That CleanChoice's Variable Rates Are Not Based On Its Costs And Market Conditions. .......... 26

VI. CleanChoice's Variable Rates Are Much Higher Than Other ESCOs' Rates, Even When Accounting For RECs. .......... 27

VII. CleanChoice Breached The Implied Covenant Of Good Faith And Fair Dealing. .......... 28

VIII. CleanChoice Committed Eight Deceptive Practices Regarding Its Variable Rates. .......... 28

IX. CleanChoice Committed Five Deceptive Practices Regarding The Renewable Source Of The Electricity It Supplies. .......... 32

X. Tolling Of The Statute Of Limitations .......... 34

XI. CleanChoice's Documented History Of Deceptive Business Practices. .......... 36

XII. The Abundant Proof That Deceptive Practices Like Those Employed By CleanChoice Have Massively Harmed Massachusetts Customers. .......... 43

**CLASS ACTION ALLEGATIONS** ..... 51

**CAUSES OF ACTION** ..... 54

**COUNT I (BREACH OF CONTRACT)** ..... 54

**COUNT II (MASSACHUSETTS CONSUMER PROTECTION ACT)** ..... 56

**COUNT III (UNJUST ENRICHMENT)** ..... 66

**PRAYER FOR RELIEF** ..... 67

**JURY DEMAND** ..... 67

Plaintiff Catherine Ware ("Plaintiff"), by her attorneys, Finkelstein, Blankinship, Frei-Pearson & Garber, LLP and Wittels McInturff Palikovic, brings this proposed class action in her individual capacity, and on behalf of a class of consumers defined below, against Defendant CleanChoice Energy, Inc. (hereinafter "CleanChoice" or "Defendant") and hereby alleges the following with knowledge as to her own acts, and upon information and belief, as to all other acts:

## NATURE OF THE CASE

1. Defendant CleanChoice is an independent energy service company ("ESCO") that sells residential and commercial electricity in Massachusetts' deregulated retail electricity market. This action seeks to redress CleanChoice's deceptive and bad faith pricing and advertising practices that have caused tens of thousands of residential and commercial customers in Massachusetts to pay considerably more for their electricity than they should otherwise have paid.

2. Defendant has taken advantage of the deregulation of Massachusetts' retail electricity market by misrepresenting how its electricity rates are calculated. CleanChoice also takes advantage of environmentally conscious consumers by promising to provide "pollution free" electricity sourced from local renewable sources when it does no such thing. Among other conduct challenged in this action, CleanChoice makes these false and deceptive claims in the customer contracts and enrollment materials CleanChoice provides to Massachusetts customers.

3. CleanChoice uniformly represents in its customer contract's variable price term that the variable electricity rate Massachusetts customers pay is "based on market conditions and CleanChoice Energy's costs to provide energy supply service."

4. CleanChoice's representation in its customer contract regarding how its variable electricity rate is determined is false and deceptive, and designed to take advantage of consumers' good faith and their lack of knowledge about, and access to, accurate information about wholesale

market conditions and CleanChoice's costs to supply customers' electricity. In reality, CleanChoice did not provide its customers with prices based on market conditions or its costs to provide energy supply service, but rather used a pricing methodology that focused on maximizing profits.

5. In 2018, the Massachusetts Attorney General's Office issued a report entitled *Are Consumers Benefiting from Competition? An Analysis of the Individual Residential Electric Supply Market in Massachusetts* (the "Attorney General Report").[1] The Attorney General Report found that individual residential customers have suffered large financial losses in the competitive supply market and went as far as recommending that legislators in Massachusetts consider eliminating the electric supply market for individual residential consumers. The Attorney General's Office issued numerous updates to the 2018 Report that reached the same conclusions.[2] CleanChoice is one of the competitive suppliers licensed in Massachusetts that harms its citizens, as discussed in the 2018 Report and subsequent updates.

6. On September 15, 2025, the Massachusetts Department of Public Utilities ("DPU") issued a Notice of Probable Violation ("NOPV")[3] detailing multiple CleanChoice deceptive practices and outlining numerous violations of the DPU's own regulations as well as regulations issued by the Massachusetts Attorney General. In evaluating CleanChoice's contractual promise to provide variable rates that are "based on market conditions and CleanChoice Energy's costs to

---

[1] Susan Baldwin, *Are Consumers Benefiting from Competition? An Analysis of the Individual Residential Electric Supply Market in Massachusetts*, MASS. ATT'Y GEN.'S OFFICE (March 2018), *available at* https://www.mass.gov/doc/comp-supply-report-final/download.

[2] *Competitive Electric Supply*, MASS. ATT'Y GEN.'S OFFICE, *available at* https://www.mass.gov/competitive-electric-supply.

[3] Mass. Dep't of Pub. Utils., *CleanChoice Energy, Inc.*, *Notice of Probable Violation*, D.P.U. 25-138 (Sept. 15, 2025), *available at* https://fileservice.eea.comacloud.net/V3.1.0/FileService.Api/file//aefgicigj?DBQIQUxUjvHmptOWDiQXpGsLVPSl7NdqNUTTiLCXtaiPcSxI+blU344Khxm+qpOeg0hKFj9M9l/xQR8+/8GqPvdGgrFe6XR6ngIfa80wd3rxFD8G4j981M2Rna9aVTXA.

provide energy supply service" the DPU found that "CleanChoice's contract summary form, and contract, conflicted with CleanChoice's actual business practice of raising prices regardless of market conditions and its energy costs" and that accordingly "CleanChoice's contract summary forms and contract were inaccurate and deceptive."[4]

7. CleanChoice also misleads its customers about the source of the energy it supplies. Upon information and belief, the enrollment form and Frequently Asked Questions Form ("FAQs") CleanChoice sent to Plaintiff and its other Massachusetts customers contained false, deceptive, and misleading representations, including that:

- Customers that switch to CleanChoice get "100% clean, pollution-free energy";
- CleanChoice Energy will source wind and solar power from farms in your region;"
- By signing up with CleanChoice, customers would "obtain your electricity from renewable sources provided by CleanChoice Energy;"
- The electricity CleanChoice sells is "produced from wind and solar sources" that "do not produce carbon dioxide or contribute to air pollution";
- Enrolling with CleanChoice would result in consuming electricity from "clean, renewable sources;" and
- That after the switch "the electricity your home uses will be replenished by clean, renewable wind and solar sources supplied by CleanChoice."

8. These statements are false and deceptive because the energy "provided by CleanChoice Energy" is neither "pollution-free" nor is it sourced from "wind and solar power from farms in your region" or "from renewable sources." Instead, the energy "provided by CleanChoice Energy" is the same "brown" energy all customers' existing utility provides. The only difference

---

[4] *Id.* at 14.

is that CleanChoice purportedly pairs customers' purchases with renewable energy certificates ("RECs") that represent the production of renewable energy by a third party.

9. Purchasing RECs to offset the emissions from "brown" energy is not the same as providing pollution-free energy sources directly to the customer's home from "wind and solar power from farms in your region," as CleanChoice's marketing falsely claims.

10. CleanChoice does not supply their customers with an energy mix that is any different from what customers' existing utility supplies and delivers on the ESCO's behalf. CleanChoice does not divert the brown energy a customer would otherwise receive and then replace that energy with renewable energy sourced locally by the ESCO.

11. The purchase of RECs does not magically convert "brown" electricity derived from fossil fuels into local, pollution-free electricity. The more energy a CleanChoice customer uses, the more pollution that customer creates. Yet CleanChoice's marketing would have customers falsely believe that their electricity consumption created no more pollution than not using electricity at all.

12. CleanChoice abused the information asymmetry between it and its customers and omitted material information from its contract, FAQs, and enrollment form. For example, CleanChoice failed to adequately disclose (i) that CleanChoice's variable energy rates are consistently and significantly higher than the rates the customer's existing utility charges, (ii) CleanChoice's actual variable rate methodology that it uses to calculate a customer's monthly variable rate, and (iii) the conditions that must be present for a variable rate customer to save money compared to what the customer's local utility would have charged.

13. As a result of this and the other deceptive, unlawful, and unauthorized acts described herein, tens of thousands of unsuspecting Massachusetts customers have been, and

continue to be, fleeced by CleanChoice out of millions of dollars in exorbitant charges for electricity.

14. Defendant's scheme, which often affects society's most vulnerable citizens, is immoral, unethical, oppressive, and unscrupulous. Exorbitant energy prices have devastating consequences for families struggling to pay their monthly utility bills, housing costs, auto costs, food, medicine, and other necessities. When there is not enough in the budget to meet these basic needs, families may face disconnection from vital utility service, inability to fully cover food and healthcare costs, and other changes that can harm the health, safety, and well-being of vulnerable families.

15. Plaintiff and other Massachusetts CleanChoice customers (the "Class") have been injured by Defendant's unlawful and unauthorized practices. Plaintiff and the Class therefore seek damages, restitution, statutory penalties, punitive damages, and declaratory and injunctive relief for CleanChoice's breach of contract, breach of the duty of good faith and fair dealing, violation of Massachusetts consumer protection law, and unjust enrichment.

16. Only through a class action can CleanChoice's customers remedy Defendant's ongoing wrongdoing. Because the monetary damages suffered by each customer are small compared to the much higher cost a single customer would incur in trying to challenge CleanChoice's unlawful practices, it makes no financial sense for an individual customer to bring his or her own lawsuit. Further, customers do not realize they are victims of CleanChoice's deceptive and unlawful conduct. With this class action, Plaintiff and the Class seek to level the playing field and make sure that companies like CleanChoice engage in fair and upright business practices.

## PARTIES

17. Plaintiff Catherine Ware resides in West Roxbury, Massachusetts. Plaintiff signed up with CleanChoice in or around February of 2021, and she did so expecting to receive electricity solely from local, pollution-free sources provided by CleanChoice at a reasonable cost. Soon after switching to CleanChoice, Plaintiff Ware was charged an exorbitant monthly variable electricity rate. Plaintiff canceled her CleanChoice service and her last CleanChoice bill was in April 2025.

18. As a result of Defendant's deceptive and otherwise improper and unauthorized conduct, Plaintiff incurred excessive charges for electricity.

19. Defendant CleanChoice Energy, Inc. is a Maryland corporation headquartered at 1055 Thomas Jefferson St. NW, Washington, DC 20007. On information and belief, CleanChoice does not have an office in Massachusetts.

## JURISDICTION AND VENUE

### I. Subject Matter Jurisdiction

20. This Court has jurisdiction over the claims asserted in this action pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d), because the aggregate claims of the Class exceed the sum or value of $5,000,000, the Class has more than 100 members, and diversity of citizenship exists between at least one member of the Class and Defendant.

### II. Personal Jurisdiction

21. This Court has specific personal jurisdiction over Defendant because Defendant purposefully directed its conduct into this jurisdiction by distributing, and selling electricity to Plaintiff and other Massachusetts consumers, and Plaintiff's claims against Defendant arise from Defendant's conduct in Massachusetts.

## III. Venue

22. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(1). Substantial acts in furtherance of the alleged improper conduct occurred within this District. CleanChoice supplied electricity to Plaintiff's residence, which is located in West Roxbury, Massachusetts.

# FACTUAL ALLEGATIONS

## I. The History Of Deregulation And ESCOs' Role In Electricity Markets

23. In the late 1990s, numerous state legislatures and state regulatory agencies deregulated the market for retail energy supply. Massachusetts deregulated its electricity market in 1997. St. 1997, c. 164, § 1(a). Among the goals of deregulation were increased competition, with an eye towards reducing energy rates consumers and small businesses pay. As a result, the Massachusetts electricity supply market is open to competition, and consumers and small businesses may choose their energy supplier.

24. ESCOs, the new independent energy suppliers, compete primarily against local utilities. ESCOs purchase energy directly or indirectly from companies that produce energy. ESCOs then sell that energy to end-user customers. However, ESCOs do not ***deliver*** energy to customers' homes and businesses, and many do not produce electricity or natural gas. Rather, the companies that produce energy deliver it to customers' utilities, which in turn deliver it to the customer. ESCOs merely buy electricity and gas at wholesale and then resell that energy to end-users with a mark-up. Thus, ESCOs are essentially brokers and traders: they neither produce nor deliver electricity or gas, but merely buy energy from a producer and re-sell it to customers. The local utility also continues to bill the customer for both the energy supply and delivery costs.

25. ESCOs are subject to minimal regulation by state utility regulators like the Massachusetts Department of Public Utilities. ESCOs like CleanChoice do not have to file their rates, or the method by which those rates are set, with regulators.

26. Customers who do not switch to an ESCO for their energy supply continue to receive supply from their local utility. Under Massachusetts law, electricity supply is procured in a competitive market. Utilities like EverSource charge energy supply rates that reflect the same supply costs ESCOs like CleanChoice incur. This is because the utilities acquire electricity supply through a competitive bidding process, and they pass the wholesale cost of electricity and the associated market costs (*i.e.*, ancillary services, installed capacity, and transmission—the same costs ESCOs such as CleanChoice incur) directly to their customers with a small markup to account for the utility's incremental overhead costs and adjustments when necessary as stipulated in their tariffs. Accordingly, the rates utilities like EverSource charge for supply is an ideal proxy for a variable monthly electricity rate that is "based on market conditions and CleanChoice Energy's costs to provide energy supply service" as CleanChoice promised in its customer contract.

27. ESCOs such as CleanChoice can use the same competitive markets utilities use to procure energy supply, and they have more options to acquire energy than the utilities, including: owning energy production facilities; purchasing energy from wholesale marketers and brokers at the price available at or near the time it is used by the retail consumer; and by purchasing energy in advance of the time it is used by customers, for example by purchasing futures contracts for the delivery of electricity and gas in the future at a predetermined price. The fundamental purpose of deregulation is to allow ESCOs to use these and other innovative purchasing strategies to reduce energy acquisition costs and pass those savings on to customers.

28. Because of their increased flexibility and lower overhead, ESCOs can offer rates competitive with—if not substantially lower than—the utilities' rates, and some do. Yet CleanChoice's variable rates are consistently and substantially higher than the local utility's and are wholly detached from its costs; accordingly, no consumer would ever agree to CleanChoice's variable rate if they knew the truth. The only way CleanChoice can retain variable rate customers is by hiding the fact that the driving factor behind its variable rate is not CleanChoice's costs to provide energy supply service, but CleanChoice's unbridled price gouging and profiteering (even when accounting for the small additional cost CleanChoice incurs to buy RECs).

29. CleanChoice took advantage of deregulation and the lack of regulatory oversight to charge customers exorbitant rates for electricity. In theory, energy deregulation allows customers to shop for the best energy rates, and it allows customers to take advantage of market-based rates that decline when the wholesale cost of energy declines. However, CleanChoice exploits deregulated markets by consistently charging its customers far more than the local utility for the same energy and failing to adequately disclose the truth about how its variable rates are determined.

## II. Plaintiff's Dealings With CleanChoice

30. In February 2021, Plaintiff received CleanChoice's marketing materials comprising of the FAQs, Terms and Conditions, Important Notice Action Requested with the perforated Clean Energy Authorization Form.

31. On information and belief, the FAQs page contained the following questions and answers (highlighting added for emphasis):

**Q. If I switch my electricity to clean, renewable sources, who will my utility company be?**

A. Eversource will still maintain the wires, prepare your bill and provide reliable service. The only thing that will change is that the electricity your home uses will be replenished by clean, renewable wind and solar sources supplied by CleanChoice Energy.

**Q. What will happen to my electricity bills?**

A. In short, supporting new renewable energy costs more than polluting energy. For most consumers, the biggest factor determining the size of their bill is the amount of electricity they use. Residential electricity use is typically higher in the winter and summer months when usage is almost always the biggest factor influencing electricity bills.

**Q. Where will the clean energy come from?**

A. When you choose clean energy, Eversource will get your energy from a licensed energy supplier, CleanChoice Energy. CleanChoice Energy will source wind and solar power from farms in your region. For customers in Massachusetts, CleanChoice Energy procures renewable energy certificates from the following states: MA, NY, NH, ME, RI, PA and VT. Other offers may vary.

**Q. How is renewable energy different?**

A. Renewable energy is produced from wind and solar sources. Unlike conventional electricity sources, renewable sources do not produce carbon dioxide or contribute to air pollution.

32. These are deceptive, false, and misleading representations.

33. For example, one of the answers states that the biggest factor determining the size of the bill is the amount of electricity used. The omission of price as a factor in "determining the size of their bill" implies that price is not significant. Yet, it is a primary factor for customers that are charged CleanChoice's monthly variable price.

34. On information and belief, the Important Notice Action Requested form also includes the following misrepresentations (highlighting added for emphasis):

1. Simply sign and return the form below.

2. Get 100% clean, pollution-free energy.

. . .

BENEFITS OF CHOOSING CLEAN ENERGY:

- Reduce air pollution
- Reduce toxic waste
- Promote a healthier future

35. The Clean Energy Authorization Form Plaintiff signed contained the following misrepresentation:

> **Return this form in the postage-paid envelope enclosed to obtain your electricity from renewable sources provided by CleanChoice Energy.**

36. Plaintiff returned the perforated Clean Energy Authorization form, which, on information and belief, was attached to the FAQs, filling in her account number and providing the date, email address, and signature.

37. On information and belief, the terms and conditions enclosed in the marketing materials included the following sentence: "If you choose to enroll, you will receive full terms and conditions further explaining the details of your plan."

38. Subsequently, Plaintiff received full terms and conditions, which included the Electric Supply Contract Summary and MA Residential and Small Commercial Contract.[5] The

---

[5] Plaintiff did not keep a copy of the enclosed contract but in 2025 Plaintiff contacted CleanChoice and requested her contract. CleanChoice sent her what it claimed represented the terms the parties agreed to when Plaintiff signed up.

MA Residential and Small Commercial Contract included the following language defining the parties' agreement: "This disclosure statement, including the product summary and general terms, Contract Summary, and Product Label together with your signed written enrollment form, electronic online enrollment record or recorded telephonic voice enrollment confirming your enrollment is an agreement for electric generation services between you ('Customer') and CleanChoice Energy, Inc., ('CleanChoice Energy,' 'We,' or 'Us')."

39. Section 19 of the General Terms contains the following merger clause: "This Agreement supersedes all prior agreements between us, either written or oral." In other words, the full terms of service Plaintiff received after she had mailed the Authorization Form superseded all prior agreements between Plaintiff and CleanChoice, including the terms of service included in the marketing materials.

40. The Contract Summary—which was incorporated into the parties' agreement—provided that Plaintiff was initially enrolled in a fixed teaser rate of 12.40¢ per kWh that after three months converted to variable rate which "is subject to change monthly, based on market conditions and CleanChoice Energy's costs to provide energy supply service – your future monthly prices may be higher or lower than the introductory price."

41. Section 7 of the general terms also provided that: "After the end of the Initial Term, this Agreement will automatically renew on a month-to-month basis at a price per kWh that may vary monthly depending on market conditions."

42. The DPU determined that the term "market conditions" refers to conditions in the wholesale market: "The term 'market conditions' indicates a tie to market prices and related costs incurred by [CleanChoice]."[6]

---

[6] NOPV at 22.

43. Plaintiff received the fixed rate in April, May, and June of 2021, after which she was switched to the variable rate and continued to receive variable rate electricity from CleanChoice until April 2025.

44. In light of the representations in CleanChoice's customer contract, any reasonable customer, including Plaintiff, would reasonably expect that CleanChoice's variable rates would only vary in light of wholesale market conditions or its supply costs. Instead, CleanChoice charged its customers variable rates that were untethered from wholesale market conditions or its supply costs to maximize its own profits.

45. The term "based on" provides exclusivity and precludes CleanChoice's rate-setting discretion such that monthly fluctuations in its variable electricity rates can be determined solely by "market conditions" or CleanChoice's "costs to provide energy supply service." Reasonable consumers understand that when you make a calculation "based on" specific factors, you take only those factors into account; the calculation is made "relying on" or "building on" those factors. For example, you calculate a baseball player's batting average "based on" that player's number of hits and number of at bats—nothing more and nothing less. The area of a rectangle is calculated "based on" its width and length, while velocity is calculated "based on" distance and time. Here, CleanChoice's use of the term "based on" limits the variation in the variable rates to be determined solely by market conditions or CleanChoice's costs. An assessment of those market conditions and costs, however, shows that CleanChoice did not base customers' variable rates on those inputs and instead added exorbitant and fluctuating markups.

46. Indeed, CleanChoice charges its customers variable rates that are untethered from these factors to maximize its own profits. Upon information and belief, and despite the rate-setting formula set forth in its customer contract, CleanChoice did not perform rate calculations that

produced variable rates "based on" its market conditions and its costs. Upon information and belief, CleanChoice performed no calculations that build up to a rate that complies with its contract's pricing formula.

47. In addition, CleanChoice misrepresents the source of its electricity in its marketing materials. Rather than piping electricity produced exclusively from local wind and solar farms to customers' homes as its marketing misleadingly represents, CleanChoice simply purchases wholesale "brown" electricity from the same market used by customers' utilities and buys additional renewable energy credits that represent the production by another entity of renewable energy in the form of RECs (production that would occur whether or not CleanChoice bought the RECs). CleanChoice then deceptively tells its customers that its electricity comes from renewable sources and justifies its price gouging for this brown electricity by repackaging it as energy from renewable sources.

48. Other than a desire to promote or use renewable energy, price is the most important consideration for potential CleanChoice consumers. Given that there is no difference at all in the electricity that ESCOs supply as opposed to the consumer's local utility, the only reason a consumer would switch to CleanChoice is for the potential savings offered in a competitive market as opposed to prices offered by a regulated utility, plus a willingness to pay the costs of RECs.

## III. CleanChoice's Variable Rates Are Much Higher Than Benchmark Local Utility Rates, Even When Accounting For RECs.

49. The publicly available data on the local utilities' energy procurement costs (like EverSource, the utility serving Plaintiff's residence), serve as an ideal indicator of the wholesale cost of energy CleanChoice pays for supply and the other applicable "market conditions" because the utilities pay these costs and operate with these same market conditions. *See* EverSource: Electric Delivery Charge and Supply Cost ("The supply rate is based on the current market price

of electricity.").[7] In fact, when calculating the overpayment by Massachusetts consumers caused by ESCOs practices, the 2018 Attorney General's Office report used the amount the consumers "would have paid if they had received electric supply from their electric company."[8]

50. Not only are local utilities CleanChoice's primary competitors (as utilities always are), but the local utility's procurement costs are the best indicator of CleanChoice's procurement costs and the market conditions that affect those costs. The utility's procurement costs track the competitive public market for wholesale electricity and the associated market costs (*i.e.*, ancillary services, installed capacity, and transmission—the same costs ESCOs such as CleanChoice incur). In other words, Plaintiff's utility purchases wholesale electricity for its customers on an open free market and passes those costs onto consumers; CleanChoice could do the same.

51. Consequently, the public data on the local utility's electricity supply costs are an ideal comparator for calculating the variable rate CleanChoice's contract promised because the utility is CleanChoice's primary competitor and the utility's costs represent wholesale market prices for electricity and associated costs (even when accounting for REC costs).

52. In fact, CleanChoice has a tactical advantage over the utilities as it can (and does) combine wholesale purchasing with additional financial products. For example, in a January 9, 2018 interview, CleanChoice's CEO Tom Matzzie stated "[w]e're a member of the wholesale energy markets" including "the wholesale power markets, the PJM and New York ISO and ISO New England and MISO."[9] The CEO continued, "we transact there with the suppliers" and "we

---

[7] *Electricity Delivery and Supply Charges Explained*, EVERSOURCE, *available at* https://www.eversource.com/residential/account-billing/manage-bill/about-your-bill/understanding-your-bill/delivery-charge-supply-cost.

[8] Attorney General Report at vii.

[9] Experts Only Podcast, *Interview with CleanChoice CEO Tom Matzzie*, *available at* https://cleancapital.com/resources/episode-14-tom-matzzie/.

have trading relationships with wholesale energy suppliers, generators, and investment banks who provide financial derivatives."[10] The CEO also made clear that CleanChoice's wholesale "procurement" is "actually the least exciting and interesting part of our business. It doesn't move very fast and that's good. We're not speculators."[11]

53. Accordingly, CleanChoice's costs for purchasing energy should at the very least reflect (if not undercut) the market prices utilities pay, albeit over a longer term. Therefore, while the utility's procurement costs might not precisely match Defendant's actual costs (which are not available without discovery), CleanChoice's costs should correlate with the utility's costs and over time should be roughly similar (even when accounting for REC costs). Instead, CleanChoice's exorbitant rates when compared to CleanChoice's supply costs demonstrate that CleanChoice's rates did not only vary according to market conditions as required by its customer contract.

54. The following table compares Plaintiff's electricity supply rates from CleanChoice to her local utility EverSource's contemporaneous supply rate. The first three months represent Plaintiff's initial fixed rate term, and the following 46 months encompass her time receiving a variable rate. The table below also calculates the differences between CleanChoice's rates and the EverSource rate ("Overcharge Multiplier").

| Billing Period | CleanChoice Rate ($/kWh) | EverSource's Rate ($/kWh) | Overcharge Multiplier |
|---|---|---|---|
| April 2021 | $0.12 | $0.14 | 0.9 |
| May 2021 | $0.12 | $0.14 | 0.9 |
| June 2021 | $0.12 | $0.13 | 0.9 |
| July 2021 | $0.18 | $0.13 | 1.4 |

[10] *Id.*

[11] *Id.*

| Billing Period | CleanChoice Rate ($/kWh) | EverSource's Rate ($/kWh) | Overcharge Multiplier |
|---|---|---|---|
| August 2021 | $0.20 | $0.13 | 1.6 |
| September 2021 | $0.24 | $0.13 | 1.8 |
| October 2021 | $0.24 | $0.14 | 1.8 |
| November 2021 | $0.32 | $0.15 | 2.1 |
| December 2021 | $0.35 | $0.16 | 2.2 |
| January 2022 | $0.35 | $0.25 | 1.4 |
| February 2022 | $0.33 | $0.24 | 1.4 |
| March 2022 | $0.33 | $0.19 | 1.8 |
| April 2022 | $0.35 | $0.16 | 2.2 |
| May 2022 | $0.39 | $0.15 | 2.6 |
| June 2022 | $0.40 | $0.13 | 3.1 |
| July 2022 | $0.41 | $0.20 | 2.1 |
| August 2022 | $0.41 | $0.20 | 2.1 |
| September 2022 | $0.42 | $0.18 | 2.3 |
| October 2022 | $0.43 | $0.18 | 2.4 |
| November 2022 | $0.50 | $0.21 | 2.4 |
| December 2022 | $0.58 | $0.28 | 2.1 |
| January 2023 | $0.60 | $0.42 | 1.4 |
| February 2023 | $0.60 | $0.42 | 1.4 |
| March 2023 | $0.60 | $0.27 | 2.2 |
| April 2023 | $0.55 | $0.19 | 3.0 |

| Billing Period | CleanChoice Rate ($/kWh) | EverSource's Rate ($/kWh) | Overcharge Multiplier |
|---|---|---|---|
| May 2023 | $0.55 | $0.17 | 3.3 |
| June 2023 | $0.44 | $0.16 | 2.7 |
| July 2023 | $0.36 | $0.18 | 1.9 |
| August 2023 | $0.35 | $0.17 | 2.0 |
| September 2023 | $0.28 | $0.15 | 1.9 |
| October 2023 | $0.34 | $0.15 | 2.3 |
| November 2023 | $0.34 | $0.19 | 1.7 |
| December 2023 | $0.34 | $0.29 | 1.2 |
| January 2024 | $0.34 | $0.28 | 1.2 |
| February 2024 | $0.34 | $0.27 | 1.2 |
| March 2024 | $0.34 | $0.18 | 1.9 |
| April 2024 | $0.34 | $0.15 | 2.2 |
| May 2024 | $0.34 | $0.14 | 2.4 |
| June 2024 | $0.34 | $0.16 | 2.1 |
| July 2024 | $0.34 | $0.18 | 1.9 |
| August 2024 | $0.34 | $0.15 | 2.2 |
| September 2024 | $0.34 | $0.15 | 2.3 |
| October 2024 | $0.34 | $0.15 | 2.3 |
| November 2024 | $0.34 | $0.17 | 2.0 |
| December 2024 | $0.34 | $0.22 | 1.5 |
| January 2025 | $0.34 | $0.26 | 1.3 |

| Billing Period | CleanChoice Rate ($/kWh) | EverSource's Rate ($/kWh) | Overcharge Multiplier |
|---|---|---|---|
| February 2025 | $0.34 | $0.21 | 1.6 |
| March 2025 | $0.15 | $0.16 | 0.9 |
| April 2025 | $0.17 | $0.14 | 1.2 |

55. Considering CleanChoice's representation in its customer contract about how its rates are calculated, no reasonable customer, including Plaintiff, would expect CleanChoice's variable rate to be artificially inflated beyond any resemblance to the local utility's costs, even accounting for the costs of RECs. Indeed, the fact that CleanChoice's rates were often ***double***, and sometimes more than ***triple*** EverSource's rates demonstrates the extent of its unscrupulous price gouging.

56. CleanChoice's costs associated with purchasing RECs are minimal compared to the cost of procuring electricity at wholesale, and REC costs cannot explain CleanChoice's exorbitant rates. Indeed, during the 2021 to 2025 time period Plaintiff was a CleanChoice customer, the cost to purchase a corresponding REC was never materially more than 4 cents per kilowatt hour (kWh). CleanChoice may have even paid less than 4 cents per kWh for the RECs paired with Plaintiff's electricity purchases. As the Massachusetts Attorney General and the mayor of Boston have noted, ESCOs like CleanChoice "routinely claim that the energy they sell helps Massachusetts achieve its clean energy goals," but "nothing could be further from the truth" because "[t]heir supply is commonly backed by cheap out-of-state energy credits that do nothing to help the Commonwealth or region achieve its ambitious and critical greenhouse gas reduction goals."[12] Unlike the energy

[12] Andrea J. Campbell & Michelle Wu, *Massachusetts should ban third-party electric suppliers*, BOSTON GLOBE (Jan. 29, 2024), https://www.bostonglobe.com/2024/01/29/opinion/michelle-wu-andrea-campbell-third-party-electric-suppliers-ban/.

sources relied on by utilities to meet their statutorily required Renewable Portfolio Standards, the sources for ESCOs' additional unbundled RECs "are not subject to regulatory scrutiny."[13]

57. Moreover, the fact that EverSource's rates decline while CleanChoice's stay the same demonstrates that CleanChoice does not set its rates based on its costs to supply the customer or market conditions. For example, from December 2023 to May 2024, EverSource's rate declined by more than 50% (from 0.29 $/kWh to 0.14 $/kWh) while CleanChoice's rate stayed constant at 0.34 $/kWh. And from January 2022 to June 2022, EverSource's rate declined by 48% (from 0.25 $/kWh to 0.13 $/kWh) while CleanChoice's rate *increased* from 0.35 $/kWh to 0.40 $/kWh.

58. Additionally, the fact that EverSource's rates fluctuated each month from October 2023 to February 2025, ranging from 0.14 $/kWh to 0.29 $/kWh, while CleanChoice's rate stayed remarkably constant at 0.34 $/kWh over this same time period, further demonstrates CleanChoice's rate is detached from its supply costs or market conditions.

59. The disconnect between EverSource's rates and CleanChoice's rates further demonstrates that CleanChoice's rates are not even remotely based on CleanChoice's costs to provide energy supply service. For all but one of the forty-six variable rate billing cycles presented, CleanChoice's rates were well-above EverSource's.

60. CleanChoice's overhead costs (which are relatively minor compared to its electricity supply costs) also cannot explain the high variable rates it charged. Indeed, EverSource's rates also include additional amounts to account for its overhead, yet CleanChoice's

---

[13] Susan M. Baldwin & Timothy E. Howington, *Consumers Continue to Lose Big: the 2023 Update to an Analysis of the Individual Residential Electric Supply Market in Massachusetts*, MASS. ATT'Y GEN.'S OFFICE (May 2023), https://www.mass.gov/doc/consumers-continue-to-lose-big-the-2023-update-to-an-analysis-of-the-individual-residential-electric-supply-market-in-massachusetts/download.

rates are far higher. *See* Basic Service Information And Rates.[14] Upon information and belief, CleanChoice's supply-related overhead costs are lower than the traditional utility's supply-related overhead costs.

**IV. CleanChoice's Variable Rates Are Much Higher Than Its Costs To Procure Electricity In The Wholesale Market, Even When Accounting For RECs.**

61. CleanChoice's contract promises rates "based on" its costs to supply energy and market conditions. CleanChoice's primary cost is its cost to buy electricity for its customers.

62. However, CleanChoice's variable rates are much, much higher than wholesale market prices in Massachusetts. The cost of wholesale electricity is the primary component of the non-overhead costs CleanChoice incurs, and CleanChoice's additional overhead costs to provide energy supply service to customers are small compared to its electricity procurement costs.

63. A comparison of CleanChoice's rates to prevailing market costs, including the cost to procure RECs, further demonstrates that CleanChoice does not charge a rate based on its costs and market conditions plus a reasonable fixed margin.

64. The table below identifies (i) billing periods during which Plaintiff was enrolled with CleanChoice's for electricity services (first three months on a fixed rate; following 46 months on a variable rate), (ii) the rate CleanChoice charged Plaintiff, (iii) the corresponding "Market Supply Costs," and (iv) the differences between CleanChoice's rates and the contemporaneous Market Supply Costs ("CleanChoice's Multiplier").

65. The Market Supply Costs below are based on the costs that an ESCO incurs supplying a retail customer for each period. The Market Supply Costs include the weighted day-ahead Independent System Operator New England ("ISO-NE") prices in Plaintiff's utility

---

[14] *Basic Service Information and Rates*, MASS. ELECTRIC POWER DIV., *available at* https://www.mass.gov/info-details/basic-service-information-and-rates.

zone, ancillary services costs, capacity costs, RECs sufficient to correspond to 100% of the electricity CleanChoice supplies, and various relatively-small charges related to the ISO-NE. These charges are tracked by ISO-NE's Market Monitor, the external consultant that independently evaluates the New England wholesale electricity market. ISO-NE's Market Monitor is appointed pursuant to ISO-NE's Federal Energy Regulatory Commission regulation and tariff.

66. The Market Supply Costs represent the supply costs that CleanChoice and other ESCOs incur in providing energy to retail customers. Each of these measures reflects the costs that CleanChoice's competitors, in the regulated or deregulated markets, incur. That CleanChoice's rates are so vastly different from the Market Supply Costs demonstrate that CleanChoice's rates are not "based on" its supply costs or market conditions as required by CleanChoice's contract.

| **Billing Period** | **CleanChoice Rate ($/kWh)** | **Market Supply Costs ($/kWh)** | **CleanChoice's Multiplier** |
|---|---|---|---|
| April 2021 | $0.12 | $0.09 | 1.4 |
| May 2021 | $0.12 | $0.09 | 1.4 |
| June 2021 | $0.12 | $0.10 | 1.3 |
| July 2021 | $0.18 | $0.10 | 1.8 |
| August 2021 | $0.20 | $0.11 | 1.8 |
| September 2021 | $0.24 | $0.11 | 2.1 |
| October 2021 | $0.24 | $0.12 | 2.0 |
| November 2021 | $0.32 | $0.12 | 2.7 |
| December 2021 | $0.35 | $0.13 | 2.7 |
| January 2022 | $0.35 | $0.23 | 1.5 |
| February 2022 | $0.33 | $0.16 | 2.0 |

| Billing Period | CleanChoice Rate ($/kWh) | Market Supply Costs ($/kWh) | CleanChoice's Multiplier |
|---|---|---|---|
| March 2022 | $0.33 | $0.12 | 2.8 |
| April 2022 | $0.35 | $0.13 | 2.7 |
| May 2022 | $0.39 | $0.14 | 2.8 |
| June 2022 | $0.40 | $0.13 | 3.2 |
| July 2022 | $0.41 | $0.16 | 2.6 |
| August 2022 | $0.41 | $0.15 | 2.7 |
| September 2022 | $0.42 | $0.12 | 3.4 |
| October 2022 | $0.43 | $0.11 | 3.9 |
| November 2022 | $0.50 | $0.13 | 4.0 |
| December 2022 | $0.58 | $0.17 | 3.3 |
| January 2023 | $0.60 | $0.12 | 4.9 |
| February 2023 | $0.60 | $0.11 | 5.5 |
| March 2023 | $0.60 | $0.09 | 6.8 |
| April 2023 | $0.55 | $0.09 | 6.5 |
| May 2023 | $0.55 | $0.08 | 6.8 |
| June 2023 | $0.44 | $0.09 | 4.8 |
| July 2023 | $0.36 | $0.10 | 3.7 |
| August 2023 | $0.35 | $0.08 | 4.1 |
| September 2023 | $0.28 | $0.09 | 3.3 |
| October 2023 | $0.34 | $0.08 | 4.0 |
| November 2023 | $0.34 | $0.10 | 3.4 |

| Billing Period | CleanChoice Rate ($/kWh) | Market Supply Costs ($/kWh) | CleanChoice's Multiplier |
|---|---|---|---|
| December 2023 | $0.34 | $0.09 | 3.6 |
| January 2024 | $0.34 | $0.12 | 2.8 |
| February 2024 | $0.34 | $0.08 | 4.1 |
| March 2024 | $0.34 | $0.07 | 4.5 |
| April 2024 | $0.34 | $0.08 | 4.5 |
| May 2024 | $0.34 | $0.08 | 4.3 |
| June 2024 | $0.34 | $0.09 | 3.8 |
| July 2024 | $0.34 | $0.10 | 3.4 |
| August 2024 | $0.34 | $0.08 | 4.1 |
| September 2024 | $0.34 | $0.08 | 4.0 |
| October 2024 | $0.34 | $0.09 | 3.9 |
| November 2024 | $0.34 | $0.11 | 3.2 |
| December 2024 | $0.34 | $0.14 | 2.4 |
| January 2025 | $0.34 | $0.19 | 1.7 |
| February 2025 | $0.34 | $0.16 | 2.1 |
| March 2025 | $0.15 | $0.09 | 1.6 |
| April 2025 | $0.17 | $0.09 | 1.9 |

67. Again, CleanChoice's variable rates are consistently and substantially higher than a rate based on its costs or market conditions, which further demonstrates that CleanChoice's rates are not set in accordance with its contract's pricing formula.

68. CleanChoice's rates are higher than the Market Supply Costs for all months and are on average 3.3 times higher than the Market Supply Costs. During this period, CleanChoice charged Plaintiff a rate that was a staggering 6.8 times higher than its Market Supply Costs. In other words, CleanChoice marked up its price to obtain more than a 500% margin. This is classic price gouging.

69. As with the comparison to EverSource's prices, CleanChoice's rates likewise fail to fluctuate in accordance with Market Supply Costs. For example, from January 2022 to March 2023, the Market Supply Cost dropped nearly 61% (from 0.23 $/kWh to 0.09 $/kWh), but CleanChoice's rate rose over 71% (from 0.35 $/kWh to 0.60 $/kWh).

70. Also, as with the comparison to EverSource's prices, the fact that Market Supply Costs fluctuated each month from October 2023 to February 2025, ranging from 0.07 $/kWh to 0.19 $/kWh, while CleanChoice's rate stayed remarkably constant at 0.34 $/kWh over this same time period, further demonstrates CleanChoice's rate is detached from its supply costs or market conditions.

71. The cost of wholesale electricity is the primary component of the non-overhead costs CleanChoice incurs. The other components of CleanChoice's procurement costs (such as capacity, ancillaries, transmission costs, transportation costs, and line losses) are relatively insignificant in terms of the overall costs Defendant incurs to provide retail electricity, and do not substantially fluctuate over time. These costs are also reflected in EverSource's rates. Moreover, other ESCOs incur these costs as well, yet they offer substantially lower rates. Nor does the cost of purchasing RECs explain CleanChoice's exorbitant rates, as the above Market Supply Costs include RECs sufficient to offset 100% of customer usage.

72. Therefore, Defendant's cost to procure energy in the wholesale market (plus additional REC costs) cannot explain Defendant's egregiously high variable rate or the reason its rates are disconnected from changes in wholesale costs.

**V. CleanChoice's Fixed Rates Prove That CleanChoice's Variable Rates Are Not Based On Its Costs And Market Conditions.**

73. CleanChoice's own fixed rates, which are significantly lower than its variable rates, demonstrate that it can cover both its supply and overhead costs and still make a reasonable profit. In fact, because CleanChoice incurs greater financial risk to provide its fixed rate offerings as compared to variable rates (because it has to charge the same rate to fixed rate customers even when wholesale costs increase substantially), a reasonable customer would expect CleanChoice to add ***lower*** margins to its variable rates. Yet the opposite is true.

74. CleanChoice's costs to provide energy supply service to customers (which are relatively minor compared to electricity procurement costs) also cannot explain the high variable rates charged, as CleanChoice's own fixed rates, which are significantly lower than its variable rates, demonstrate. For example, from July 2022 to July 2024, CleanChoice's average variable rate for EverSource customers was 45 cents per kilowatt hour.[15] CleanChoice's fixed rates for those same customers are much lower. Indeed, CleanChoice's July 2024 fixed rate for EverSource customers is 18.1 cents per kilowatt hour.[16]

75. There is no good faith justification for charging variable rate customers a rate that is outrageously higher than the rates CleanChoice charges its fixed rate customers. CleanChoice's

---

[15] *See Disclosure Statement: Historical Pricing of Variable Rates in EverSource*, CLEANCHOICE ENERGY, https://cleanchoiceenergy.com/historic/179.

[16] *See Here's what clean electricity plan is available for 02138*, CLEANCHOICE ENERGY, https://cleanchoiceenergy.com/plans?area=02138&submitted_by=%2F&edcId=223&area=02138.

costs for serving variable rate customers and fixed rate customers are not substantially different. In fact, CleanChoice's costs for serving variable rate customers are likely lower than its costs for supplying fixed rate energy. The only reason that CleanChoice's variable rates are so much higher than its fixed rates is that it engages in profiteering and price gouging with respect to its variable rate customers, a stark demonstration of its bad faith pricing practices and transparent violation of its contract's pricing term.

## VI. CleanChoice's Variable Rates Are Much Higher Than Other ESCOs' Rates, Even When Accounting For RECs.

76. CleanChoice routinely charges its customers variable rates for electricity that are amongst the highest offered by ESCOs in Massachusetts. According to data from the U.S. Energy Information Administration, CleanChoice charged its customers the highest price among 44 ESCOs in Massachusetts in 2019, the second highest price of 39 ESCOs in Massachusetts in 2020, the second highest price of 45 ESCOs in Massachusetts in 2021, the second highest price of 45 ESCOs in Massachusetts in 2022, and the sixth highest price of 40 ESCOs in Massachusetts in 2023. CleanChoice's prices were 32% higher than average in 2019, 24% higher than average in 2020, 30% higher than average in 2021, 43% higher than average in 2022, and 40% higher than average in 2023.[17] These other ESCOs have similar costs and overhead expenses to those CleanChoice incurs.

77. CleanChoice claims it buys RECs to offset 100% of its customers' electricity use. But the costs to buy those RECs does not explain why its rates are so much higher than other ESCOs' rates given that they otherwise incur the same costs (including overhead). For example, in 2022, all electricity suppliers in Massachusetts were required to pair 20% of their electricity

[17] *See Electric Sales, Revenue, and Average Price*, U.S. ENERGY INFORMATION ADMINISTRATION, Table 12, https://www.eia.gov/electricity/sales_revenue_price/.

supply with RECs. RECs cost 4 cents per kilowatt hour in 2022; therefore, CleanChoice did not incur more than 2.75 additional cents per kilowatt hour in costs to supply 100% offsetting RECs as opposed to 20% offsetting RECs. Yet CleanChoice's average price in Massachusetts for 2022 was 25.6 cents per kilowatt hour. The average price ESCOs charged in Massachusetts was 14.22 cents per kilowatt hour (making CleanChoice's average rate 80% higher). This discrepancy cannot be accounted for by the procurement of RECs, which are not expensive, costing an average of only 4 cents per kWh in 2022.

## VII. CleanChoice Breached The Implied Covenant Of Good Faith And Fair Dealing.

78. To the extent CleanChoice is found to have discretion in setting variable rates, (1) the disconnect between EverSource's rates and CleanChoice's variable rates, (2) the fact that CleanChoice's variable rates are substantially higher than its costs to procure electricity in the wholesale market, even accounting for RECs, (3) the fact that CleanChoice's variable rates are much higher than its fixed rates; and (4) the fact that CleanChoice's variable rates are much higher than other ESCOs' rates, even when accounting for RECs, demonstrate (individually and in combination) that CleanChoice violated Plaintiff's expectations that CleanChoice would exercise its discretion in a commercially reasonable manner. To the extent CleanChoice had variable rate setting discretion, it exercised it in bad faith by setting those rates to be commercially unreasonable.

## VIII. CleanChoice Committed Eight Deceptive Practices Regarding Its Variable Rates.

79. First, CleanChoice's representation in its form customer contract that its variable rates are "based on" its costs to provide energy and market conditions is false and deceptive.

80. Second, CleanChoice knew but did not disclose that its variable rates were consistently and significantly higher than the local utility's rates and those of other ESCOs, even

when accounting for RECs *See Weinberg v. CleanChoice Energy, Inc.*, No. 23-CV-09685 (PMH), 2024 WL 3446515, at *10 (S.D.N.Y. July 17, 2024) (sustaining New York customer's consumer protection claim against CleanChoice based on this material omission).

81. Third, CleanChoice knew but did not disclose that customers paying Defendant's variable energy rates receive no material added benefit in exchange for paying energy rates that are dramatically higher than the local utility's rates, other than the minimal cost of additional RECs.

82. Fourth, contrary to the pricing methodology in CleanChoice's contract, CleanChoice had a different methodology it used to calculate its variable rates, which it did not disclose to consumers. *See id.* (sustaining New York customer's consumer protection claim based on this material omission).

83. Fifth, CleanChoice knew but did not disclose the conditions that must be present for their variable rate customers to save money compared to what the customer's existing utility would have charged. *See id.* (sustaining New York customer's consumer protection claim based on this material omission).

84. Sixth, CleanChoice knew but did not disclose that its costs to purchase RECs are minimal compared with its electricity procurement costs and that REC costs did not justify CleanChoice charging rates that are dramatically higher than the local utility's rates. *See id.* (sustaining New York customer's consumer protection claim based on this material omission).

85. Defendant's failure to adequately disclose the material facts listed in the prior paragraphs were material omissions and these omissions were materially misleading because the most important consideration for any consumer choosing an energy supplier is price; energy is a fungible commodity.

86. Accordingly, and in addition to the material misrepresentations described above, CleanChoice lulled consumers into purchasing its energy supply via material omissions about its variable energy rates. Defendant did so to reap excessive profits at the expense of unsuspecting consumers. Defendant acted with actual malice, or wanton and willful disregard, for consumers' well-being.

87. Seventh, and as illustrated by the rates CleanChoice charged Plaintiff, CleanChoice's rates follow a "glide path" model. CleanChoice raises the variable rate in increasing increments so that customers are lured into inattentiveness and unlikely to notice that their energy bills have crept to stratospheric prices. This is a deceptive and unfair practice. *See id.* (sustaining New York customer's consumer protection claim based on this conduct).

88. Eighth, in the FAQ included in the marketing materials, CleanChoice listed the biggest factor determining the size of the bill as the amount of electricity customers use. This statement implied that price was not a significant factor, even though it is a primary factor.

89. No reasonable consumer would expect that CleanChoice would charge them more than the utility by so much money for so long.

90. Thus, CleanChoice's misrepresentations and omissions with respect to the rates it would charge were materially misleading.

91. In this case, CleanChoice knew that once it had acquired the consumer's energy account, it could charge high energy rates and many consumers (if not most) would not know, and simply pay the exorbitant charges, month after month.

92. It is well-established that defaults are powerful drivers of consumer behavior. There are various factors underlying this human tendency that have been discussed in the judgment and

decision-making literature, such as the work about defaults, the "status quo bias,"[18] and "Nudges."[19]

93. Defendant's exploitation of consumer inertia is further exacerbated by the fact that it is unlikely that consumers will compare CleanChoice's prices with what their local utility is charging, or that they will understand the differences in the two companies' charges so as to make the comparison effective. As the Attorney General Report observed, "As currently constructed, the Massachusetts market operates largely in a 'black box.' This lack of transparency makes it infinitely more difficult to hold bad actors in the marketplace accountable for their abuses."[20]

94. CleanChoice's customers do not have access to information about CleanChoice's costs. Nor do reasonable consumers undertake an examination of the difficult-to-access and interpret wholesale cost data applicable to their electricity market when assessing whether their electricity rates are too high. Accordingly, Plaintiff and other Massachusetts CleanChoice customers did not realize that they were being overcharged.

95. Nor would Plaintiff and other Massachusetts CleanChoice consumers have discovered that CleanChoice was overcharging them in the exercise of reasonable diligence, given the information asymmetry and the difficulty if not impossibility of obtaining information about CleanChoice's actual costs.

96. Accordingly, Plaintiff's and other Massachusetts CleanChoice customers' lack of notice, actual or constructive, that CleanChoice was overcharging them meant that they did not

---

[18] Daniel Kahneman, Jack L. Knetsch and Richard H. Thaler, *Endowment Effect, Loss Aversion, and Status Quo Bias*, THE JOURNAL OF ECONOMIC PERSPECTIVES, Vol. 5, pp. 193–206 (1991).

[19] R. Thaler and S. Sunstein, NUDGE, (Yale University Press. 2008).

[20] Attorney General Report at 42.

previously discover or reasonably should have discovered that they had a cause of action as a result of being harmed by Defendant's conduct.

## IX. CleanChoice Committed Five Deceptive Practices Regarding The Renewable Source Of The Electricity It Supplies.

97. CleanChoice also obtains customers by repeatedly misleading them about the source of the energy it supplies.

98. First, CleanChoice's enrollment form itself represented that signing up for CleanChoice meant the customer would be "**obtain[ing] your electricity from renewable sources provided by CleanChoice Energy**." (emphasis in original). This statement is false and deceptive because the energy "provided by CleanChoice Energy" is not "from" renewable sources. The energy "provided by CleanChoice Energy" is brown energy and CleanChoice then purchases RECs. CleanChoice customers are not "obtain[ing] [their] electricity from renewable sources provided by CleanChoice Energy." Rather, they are getting the same brown energy they would have gotten from the utility. CleanChoice's purchase of RECs does not mean that customers are somehow "obtain[ing] [their] electricity from renewable sources provided by CleanChoice Energy."

99. Second, CleanChoice's enrollment form misrepresents that customers are enrolling for "100% clean, pollution-free energy." This statement is false and deceptive because the energy actually supplied by CleanChoice and delivered to customers is not pollution free. Instead, the actual energy supplied to CleanChoice customers' homes is the same "brown" energy the customer would get if supplied by the utility. The only difference is that CleanChoice purports to also purchase RECs to offset the "brown" energy the customer actually uses. However, the purchase of RECs does not make the "brown" energy supplied to CleanChoice customers' homes pollution free. The more CleanChoice energy a customer uses, the more pollution they create. As the staff

of New York's energy regulator made clear, in connection with New York's market which is structured in the same way, "[t]he fuel mixes of electricity purchased on the spot market cannot be disaggregated, meaning that an ESCO cannot 'divert' the renewable portion of the spot market electricity to some customers, while serving other customers with the electricity" and that "in almost every instance, a customer who switches from the utility to an ESCO is likely to receive the same or less renewable energy than they were receiving from the utility, even if they are sold a 'green' commodity product."[21]

100. Third, on information and belief, CleanChoice's FAQs state that "the electricity your home uses will be replenished by clean, renewable wind and solar sources supplied by CleanChoice Energy." This is false because the energy delivered to a customer's home is the same "brown" energy as utility customers and enrollment with CleanChoice does not "replenish" a home's brown electricity with a different type of electricity.

101. Fourth, on information and belief, CleanChoice's FAQs state that "CleanChoice Energy will source wind and solar power from farms in your region." This is false because the energy delivered to a customer's home is the same "brown" energy as utility customers and enrollment with CleanChoice does not "source" a home's brown electricity with electricity from specific "farms in your region."

102. Fifth, on information and belief, CleanChoice's FAQs state that "[u]nlike conventional electricity sources" it provides "renewable sources" that "do not produce carbon dioxide or contribute to air pollution." This is false. CleanChoice customers receive the same

[21] NYPSC, CASE 12-M-0476, N.Y. Dep't of Pub. Serv. Staff Unredacted Initial Brief, at 69–70, N.Y. Pub. Serv. Comm'n (Mar. 30, 2018).

brown energy as utility customers, and consumption of that electricity does contribute to air pollution.

103. Plaintiff and other CleanChoice customers were injured by CleanChoice's deceptive claims about the source and "pollution-free" nature of its energy. Customers are injured by paying a premium for electricity marketed in this way when in fact they do not receive what was marketed to them. Customers are also deprived of the benefit of their bargain because pollution-free electricity actually supplied from local renewable sources is much more expensive than the brown energy CleanChoice provides. Customers including Plaintiff who knew the truth about the source of CleanChoice's electricity would not purchase it and thus would not incur CleanChoice's exorbitant charges.

## X. Tolling Of The Statute Of Limitations.

### *A. Continuing Violation Tolling Allegations*

104. Given that Defendant has engaged in a series of deceptive acts and omissions for which it billed consumers and consumers continued to pay, the continuing violation doctrine applies, effectively tolling the limitations period until the date of CleanChoice's last wrongful act against Plaintiff and other Massachusetts CleanChoice customers when CleanChoice last charged them a variable electricity rate.

### *B. Fraudulent Concealment Tolling*

105. All applicable statutes of limitation have also been tolled by Defendant's knowing and active concealment and denial of the facts alleged herein throughout the period relevant to this action.

106. Instead of adequately disclosing its true practices to Plaintiff and its other Massachusetts customers, Defendant actively concealed and misrepresented its true practices.

*C. Estoppel Tolling*

107. Defendant was under a continuous duty to disclose its practices to Plaintiff and its other Massachusetts customers.

108. Defendant knowingly, affirmatively, and actively concealed the true nature of its practices from Plaintiff and its other Massachusetts customers.

109. Based on the foregoing and the other allegations herein, Defendant is estopped from relying on any statutes of limitations in defense of this action.

*D. Discovery Rule*

110. CleanChoice's customers do not have access to information about CleanChoice's costs. Nor do reasonable consumers undertake an examination of the difficult-to-access and interpret wholesale cost data applicable to their electricity market when assessing whether their electricity rates are too high. Accordingly, Plaintiff and other Massachusetts CleanChoice customers did not realize that they were being overcharged.

111. Nor would Plaintiff and other Massachusetts CleanChoice consumers have discovered that CleanChoice was overcharging them in the exercise of reasonable diligence, given the information asymmetry and the difficulty if not impossibility of obtaining information about CleanChoice's actual costs.

112. Accordingly, Plaintiff's and other Massachusetts CleanChoice customers' lack of notice, actual or constructive, that CleanChoice was overcharging them meant that they did not previously discover or reasonably should have discovered that they had a cause of action as a result of being harmed by Defendant's conduct.

## XI. CleanChoice's Documented History Of Deceptive Business Practices.

### *A. Massachusetts DPU's NOPV Findings As To CleanChoice's Deceptive Practices*

113. In the NOPV discussed above (*supra* ¶ 6), the DPU stated that "[d]uring the period April 2022 through April 2024, the Department's Consumer Division ('Consumer Division') received complaints from 66 electricity customers, served by CleanChoice in the Commonwealth, regarding a range of problematic business practices."[22] As a result of these consumer complaints, the PUC's Prosecuting Officer issued five sets of information requests to CleanChoice.[23]

114. Based on these complaints and CleanChoice's responses to the information requests, the DPU in its NOPV identified "problematic business practices that CleanChoice employed in marketing electric supply service to residents of the Commonwealth" which together constituted "egregious misconduct and a pattern of misconduct"[24] in probable violation of Massachusetts consumer protection law.[25]

115. Among these problematic business practices, the DPU found that CleanChoice engaged in "Deceptive Pricing Practices," as its pricing conflicted with its contractual obligation to charge a variable rate based on market conditions and CleanChoice's costs to provide energy supply service.[26] The DPU noted that CleanChoice "offers electricity supply products that have a three-month fixed introductory price, which then renews to a variable monthly price if the customer does not cancel service or choose a new product." The DPU further found that "CleanChoice's contract summary form provides that 'your price is subject to change monthly,

---

[22] NOPV at 1.

[23] *Id.*

[24] *Id.*

[25] *Id.* at 10.

[26] *Id.* at 13-15.

based on market conditions and CleanChoice Energy's costs to provide energy supply service.'" This language in the contract summary the DPU considered is identical to that of Plaintiff's. The DPU tied the term "market conditions" to wholesale market by stating: "The term 'market conditions' indicates a tie to market prices and related costs incurred by the Respondent."[27]

116. In evaluating the contracts and variable rates of complaining Massachusetts consumers, the DPU noted that "[t]ypically, market conditions, energy costs, and seasonality would cause the electricity supply price to increase and decrease over time."[28] However, the DPU found that this "did not happen for these customers."[29]

117. Instead, the DPU found that CleanChoice customers experienced steady rate increases inconsistent with such typically expected fluctuation, citing "the number of months that these customers were charged a variable price, which only increased, that concerns [the DPU] here."[30] The DPU reported that for the customer rates it evaluated, the variable rate increased each month for five to nine months, with price increases between 133% to 214% increase from the introductory rate.[31]

118. The DPU accordingly concluded that "CleanChoice's contract summary forms and contract were inaccurate and deceptive" and that "[a]s such, these customers' election of the [CleanChoice's] product was not transparent or informed, thus nullifying any manifestation of

---

[27] *Id.* at 22.

[28] *Id.* at 14.

[29] *Id.*

[30] *Id.* at 13.

[31] *Id.* at 14.

affirmative choice made by customers that received these contract summary forms and contracts."[32]

119. The DPU also found that CleanChoice engaged in unfair and deceptive business practices by omitting material facts about variable rates after the customer's fixed rate expires. The DPU stated: "[CleanChoice] provides disclosures regarding its variable prices in its direct mail advertising materials – 'Your variable rate may be higher than your utility rate or other suppliers' rates' – and in its contract summary form – 'your future monthly prices may be higher or lower than the introductory price' . . . Although the disclosures provide customers with a generic warning of the product's price volatility, the direct mail advertising material and contract summary form do not provide any information regarding the potential extreme magnitude of the Respondent's variable price levels . . . Before enrolling, prospective customers are not informed of the monthly variable price(s) in effect at that time, prior history of monthly variable prices, nor any warning that its monthly variable prices could be significantly higher than the price offered for the fixed introductory price period. Following enrollment, [CleanChoice] does not notify customers of the expiration of the introductory price nor what the customer's variable price will be."[33]

120. The DPU concluded that "[a]fter the introductory fixed-price period, customers are switched to a monthly variable price that rapidly increases to levels that can be two or three times the price of basic service prices, competitors' offers, or even CleanChoice's own fixed price offers. [CleanChoice's] business practice lacks sufficient warning prior to purchasing, lacks notification of extreme price changes following enrollment, uses false disclosures regarding causes of price

---

[32] *Id.* at 15.

[33] *Id.* at 15.

increases . . . . These misrepresentations induced customers to enroll in CleanChoice's product offerings to their detriment. In my view, the practice creates a false impression for reasonable consumers about the price of the product following the introductory period."[34]

121. The DPU also found that CleanChoice engaged in unfair and deceptive business practices by omitting the price as a factor affecting the size of customer electricity bills. The DPU considered two direct mail pieces. In one of them the FAQ stated: "Q. What will happen to my electricity bills? A. In short, supporting new renewable energy costs more than polluting energy. Please see important offer details for more information about price and average costs based on usage."[35] In another one, the FAQ stated: "Q. What will happen to my electricity bills? A. In short, supporting new renewable energy costs more than polluting energy. For most consumers, the biggest factor determining the size of their bill is the amount of electricity they use. Residential electricity use is typically higher in the winter and summer months when usage is almost always the biggest factor influencing electricity bills."[36] The DPU found that "The omission of price as a factor in 'determining the size of their bill' in one of the marketing pieces, implies that price is not significant. Yet, it is a primary factor for customers on CleanChoice's monthly variable price."[37] The DPU concluded that "[f]or customers that received the direct mail advertisement claiming the biggest factor is the amount of electricity they use, the claim is misleading. CleanChoice's omission was inaccurate and deceptive."[38]

---

[34] *Id.* at 19-20.

[35] *Id.* at 23.

[36] *Id.*

[37] *Id.*

[38] *Id.*

122. The DPU also found that CleanChoice engaged in violations of applicable consumer protection law related to: Unauthorized Customer Enrollment;[39] and Deceptive or Misleading Customer Service Conduct.[40]

*B. History Of Other CleanChoice Deceptive Business Practices*

123. CleanChoice has a long record of using deceptive marketing and sales practices, which a 2022 investigative report describes as "a disturbing pattern of behavior" built upon "a fundamentally misleading for-profit business model that capitalizes on a lack of popular understanding about how electrical grids operate."[41]

124. Indeed, in 2023, CleanChoice paid $600,000 in a settlement[42] with the staff of the Illinois Commerce Commission and two consumer advocacy organizations that alleged that "CleanChoice asks customers to pay a premium for grid power matched with Renewable Energy Credits (RECs), but fails to provide critical information, such as what type of RECs are being offered, where the RECs were generated, and the 'price to compare' (the default utility's current supply price). Without this information, customers cannot evaluate the costs and benefits of these offers."[43]

---

[39] *Id.* at 24-25.

[40] *Id.* at 25-28.

[41] William Bredderman, *Critics Say CleanChoice Energy, Founded By Political Operatives, Targets Eco-Conscious Consumers With Misleading Promotions*, DAILY BEAST (Mar. 29, 2022, 4:05 AM), https://www.thedailybeast.com/cleanchoice-energy-is-the-sneaky-green-energy-company-that-pisses-off-climate-do-gooders.

[42] Settlement Agreement, *Environ. Law & Policy Cen. v. CleanChoice Energy, Inc.*, Ill. Com. Comm'n, No. 20-0499 (Mar. 7, 2023), https://web.archive.org/web/20230811220824/https://www.icc.illinois.gov/docket/P2020-0499/documents/335456/files/584468.pdf.

[43] Verified Formal Complaint at 1, *Environ. Law & Policy Cen. v. CleanChoice Energy, Inc.*, Ill. Com. Comm'n, No. 20-0499 (May 29, 2020), https://www.icc.illinois.gov/docket/P2020-0499/documents/300091/files/523255.pdf.

125. CleanChoice's practices have also caught the attention of other state and local officials over the years. For example, in 2017, the Town of Acton, Massachusetts alerted the DPU that CleanChoice was running "a misleading marketing campaign," by sending advertisements to residents and "creating the impression that it is a government communication."[44]

126. In 2016, CleanChoice (then operating under the name "Ethical Electric")[45] entered into an Assurance of Voluntary Compliance ("AVC") with the Illinois Attorney General in a matter alleging that CleanChoice improperly marketed its electricity as "green" when it was really just supplying "brown" energy paired with the use of RECs as offsets, and that it claimed its price was comparable to the local utility when it was "routinely more than 5 percent higher."[46] Specifically, the Illinois Attorney General's action stemmed from CleanChoice's direct mail solicitations promoting its "Clean Energy Option" product as powering customers' homes with electricity generated exclusively from renewable energy sources like wind and solar. In truth, however, the electricity provided was simply electricity from the electric grid that was then paired with RECs. As part of the AVC, CleanChoice agreed to make $3 million available to customers.[47]

127. And in 2015, CleanChoice (operating under the "Ethical Electric" name) entered into an AVC with the Pennsylvania Attorney General for misleading customers into thinking its

---

[44] Letter from Steven L. Ledoux, Town Manager of Action, to Nancy Stevens, Director, Mass. Dep't Pub. Utils. (Aug. 4, 2017), https://www.actonma.gov/DocumentCenter/View/3921/Letter-of-Complaint---Mass-Dept-Public-Utilities?bidId=.

[45] *Ethical Electric Is Now CleanChoice Energy*, CLEANCHOICE ENERGY, (Oct. 31, 2016), https://cleanchoiceenergy.com/news/cleanchoice_energy_announcement.

[46] *Lisa Madigan, Ill. Att'y Gen., Madigan Reaches Settlement With Ethical Electric For Misleading Marketing About Its Renewable Energy Product* (Aug. 8, 2016), https://web.archive.org/web/20160819020816/http://www.ag.state.il.us/pressroom/2016_08/20160808b.html.

[47] *Id.*

advertisements were from the local utility, rather than from an ESCO.[48] The AVC required CleanChoice to cease its misleading advertising practices.[49]

128. The complaint statistics for CleanChoice tell a similar story. The New York Office of Consumer Services ("OCS") monitors the number and types of complaints received against ESCOs operating in New York.[50] OCS divides the complaints into "initial complaints" and "escalated complaints." Initial complaints are all complaints first submitted to OCS. If those complaints are not addressed by the ESCO, they require further investigation by OCS and are categorized as escalated complaints. OCS has a record of the number of complaints for 82 ESCOs in 2022 and for 67 ESCOs in 2023. In 2022, CleanChoice had the second most initial complaints brought against it out of all 82 ESCOs.[51] In 2023, CleanChoice had the most initial complaints brought against it out of all 67 ESCOs.[52] In 2022, CleanChoice had the second most escalated

---

[48] Myles Snyder, *AG: Ethical Electric Misled Consumers*, ABC27 NEWS, https://www.abc27.com/news/ag-ethical-electric-misled-consumers/ (last updated June 11, 2015); *see also* N.H. Pub. Utils. Comm'n, No. DM 17-028, *CleanChoice Energy, Inc. Renewal Registration as a Competitive Electric Supplier*, ¶ 16 (Feb. 14, 2017), https://www.puc.nh.gov/regulatory/Docketbk/2017/17-028/INITIAL%20FILING%20-%20PETITION/17-028_2017-02-14_CCE_RENEWAL_REG_CEPS.PDF.

[49] *Id.*

[50] N.Y. Dep't Pub. Serv., Matter No. 19-00950, *Monthly Report December 2023* (Jan. 19, 2024), https://documents.dps.ny.gov/public/MatterManagement/CaseMaster.aspx?MatterCaseNo=19-00950&submit=Search.

[51] *Id.* at 15–17.

[52] N.Y. Dep't Pub. Serv., Matter No. 19-00950, *Monthly Report May 2024* at 15–16 (June 27, 2024), https://documents.dps.ny.gov/public/MatterManagement/CaseMaster.aspx?MatterCaseNo=19-00950&submit=Search

complaints[53] and tied for the most escalated complaints brought against it in 2023.[54] Comparing the number of complaints to OCS brought against all ESCOs in New York, CleanChoice had: (i) over ***17 times*** the median number of initial complaints brought against it in 2022; (ii) over ***9 times*** the median number of initial complaints brought against it in 2023; (iii) ***14 times*** the median number of escalated complaints brought against it in 2022; and (iv) ***8 times*** the median number of escalated complaints brought against it in 2023.[55]

## XII. The Abundant Proof That Deceptive Practices Like Those Employed By CleanChoice Have Massively Harmed Massachusetts Customers.

129. In restructuring the Massachusetts electricity market, the state legislature recognized that "electricity service is essential to the health and well-being of all residents of the commonwealth." St. 1997, c. 164, § 1(a). "Deregulation of the residential electric supply market promised to bring consumers in Massachusetts and other states a choice of electricity supply providers and lower bills."[56]

130. As mentioned above, the Attorney General Report and subsequent updates noted:

- During the study period, basic service rates decreased by almost 16 percent, while the loss experienced by low-income customers on competitive supply increased by 35 percent.

---

[53] N.Y. Dep't Pub. Serv., Matter No. 19-00950, *Monthly Report December 2023* at 18 (Jan. 19, 2024), https://documents.dps.ny.gov/public/MatterManagement/CaseMaster.aspx?MatterCaseNo=19-00950&submit=Search.

[54] N.Y. Dep't Pub. Serv., Matter No. 19-00950, *Monthly Report May 2024* at 17 (June 27, 2024), https://documents.dps.ny.gov/public/MatterManagement/CaseMaster.aspx?MatterCaseNo=19-00950&submit=Search

[55] *See id.*

[56] Dec. 11, 2023, Letter from E. Markey, E. Warren, and A. Pressley to Lina M. Kahn, Chair of the Federal Trade Commission ("Legislators' Letter") at 1 (Dec. 11, 2023), https://www.markey.senate.gov/imo/media/doc/letter_to_ftc_on_competitive_electric_suppliers_-_121123pdf.pdf.

- Low-income customers make up a disproportionately large share of the competitive supply market [with] low-income households participate in the competitive supply market at twice the rate as non-low-income households.
- My analysis also shows that these low-income customers pay especially high prices in the competitive supply market. . . . [A]ssuming an average monthly usage of 600 kWh across both income groups, the annual consumer loss for low-income participants is $252, which is 17 percent higher than the annual consumer loss of $216 for non-low-income participants.
- My analysis shows that residents in communities with the following demographics *paid higher rates* to competitive suppliers:

  • Communities with low median incomes;

  • Communities with high percentages of households receiving subsidized low-income rates;

  • Communities with high percentages of minority households; and

  • Communities with high percentages of households with limited English proficiency.

131. The Attorney General Report reached the following conclusions:

> My analysis demonstrates that individual residential customers have suffered large financial losses in the competitive supply market. The size of the harm to consumers, the significant loss in both years of the study, and the increasing loss from one year to the next, strongly suggest that consumer harm is likely to continue.
>
> Although a regulatory environment with stronger consumer protection measures would be preferable to the status quo, experience in Massachusetts and in other states demonstrates that stronger consumer protection measures are insufficient to transform the competitive supply market from one that causes significant net harm to one that provides net benefits.
>
> Accordingly, I strongly recommend that legislators in Massachusetts consider eliminating the electric supply market for individual residential consumers.

132. Subsequent updates to the 2018 AGO Report in 2019, 2021, 2023, 2024, and 2025 reaffirmed the above findings and conclusions and attracted the attention of lawmakers and other elected officials.[57]

133. For example, relying on the AGO Reports, both of Massachusetts' two United States Senators and a Massachusetts Member of Congress recently noted, "consumers—disproportionately in low-income communities and communities of color—have endured unfair and deceptive marketing and sales tactics by competitive electric suppliers, saddling those consumers with higher electric bills and costing them hundreds of millions of dollars in net losses."[58]

134. The Legislators' Letter cites the findings of the Massachusetts Attorney General's office that "in the last seven years, individual residential customers who received their electric supply from competitive suppliers paid $607 million more on their electric bills than they would have paid to their default utility."[59] As the Attorney General testified to the state legislature, "these suppliers use deceptive marketing tactics that hide the fact that their products do not provide consumers with meaningful savings and in fact, can result in higher utility bills."[60] ESCOs' deceptive tactics also include, "failing to disclose industry consensus about price drops and that,

---

[57] *Competitive Electric Supply*, MASS. ATT'Y GEN.'S OFFICE, *available at* https://www.mass.gov/competitive-electric-supply.

[58] Legislator's Letter at 1.

[59] *Id.* (citing Remarks of Attorney General Andrea Joy Campbell before the Joint Committee on Telecommunications, Utilities and Energy, Massachusetts House of Representatives (Sept. 21, 2023) ("MA A.G. Remarks"); *see also* Miriam Wasser, *Why a plan to drive down electric prices in Mass. Led to higher bills*, NPR (May 8, 2023), https://www.wbur.org/news/2023/05/08/massachusetts-eversource-national-grid-third-party-competitive-electricity.

[60] *Id.* (citing MA A.G. Remarks)

if basic service prices decreased, consumers would pay higher prices under the competitive plan."[61]

135. Further, the Massachusetts Attorney General and the mayor of Boston have also recently noted that ESCOs in Massachusetts have employed "pervasive misleading marketing practices," and like CleanChoice here have made "false claims of clean, green energy." [62] ESCOs like CleanChoice "have a track record of deploying aggressive, deceptive marketing tactics, making misleading promises about savings and clean energy, and enticing residents with lower initial rates that often skyrocket after a few months."[63] "Third-party suppliers also routinely claim that the energy they sell helps Massachusetts achieve its clean energy goals" but "nothing could be further from the truth."[64]

136. ESCOs' misleading practices are not isolated to Massachusetts. An analysis by the *Wall Street Journal*, for example, found that "in nearly every state where they operate, retailers have charged more than regulated incumbents."[65] Data from Massachusetts, Connecticut, Illinois, Maine, Maryland, New York, and Pennsylvania confirm that consumers pay far too much when they sign up with ESCOs instead of sticking with their utility companies.[66]

---

[61] *Id.* at 3.

[62] Campbell & Wu, n.12 *supra*.

[63] *Id.*

[64] *Id.*

[65] Scott Patterson & Tom McGinty, *Deregulation Aimed to Lower Home-Power Bills. For Many, It Didn't*, WALL ST. J. (Mar. 8, 2021), https://www.wsj.com/articles/electricity-deregulation-utility-retail-energy-bills-11615213623?page=16.

[66] Jenifer Bosco, *Retail 'choice': A bad deal for consumers and the planet*, UTILITY DIVE (Sept. 22, 2023), https://www.utilitydive.com/news/retail-choice-bad-deal-consumers-arrearages-renewable-energy-communitychoice/694355/.

137. In New York (whose deregulated electricity market functions the same as the Massachusetts market), the staff of New York's utility regulator (that "NYPSC") made the following findings relevant here:

> [M]ass market ESCO customers have become the victims of a failed market structure that results in customers being fooled by advertising and marketing tricks into paying substantially more for commodity service than they had remained full utility customers, yet thinking they are getting a better deal.[67]
>
> * * *
>
> The primary problem with the retail markets for mass market customers is the overcharging of customers for commodity due to the lack of transparency to customers on ESCO prices and products; this lack of transparency allows ESCOs to charge customers practically whatever they want without customers' understanding that they are paying substantially more than if they received full utility service. Consequently, potential commodity customers attempting to choose between the ESCO offerings and the default utility service cannot readily determine which ESCO offers the best price for comparable products or if the ESCOs' prices can possibly "beat" or even be competitive with the utility's default commodity service for the duration of the contract term.
>
> Thus, as the current retail access mass markets are structured, customers simply cannot make fully informed and fact-based choices on price . . . since the terms and pricing of the ESCO product offerings are not transparent to customers. For variable rate products this is due, in large part, to the fact that ESCOs often offer "teaser rates" to start, and after expiration of the teaser rate, the rate is changed to what is called a "market rate" that is not transparent to the customer, and the contract signed by the customer does not provide information on how that "market rate" is calculated.[68]
>
> * * *
>
> ESCOs take advantage of the mass market customers' lack of knowledge and understanding of, among other issues, the electric and gas commodity markets, commodity pricing, and contract terms (which often extend to three full pages), and in particular, the

---

[67] CASE 12-M-0476, Dep't of Public Service Staff Unredacted Initial Brief, at 1, N.Y. Pub. Servs. Comm'n (Mar. 30, 2018).

[68] *Id.* at 41–42 (citations omitted).

> ESCOs' use of teaser rates and "market based rate" mechanisms that customers are charged after the teaser rate expires. In fact, ESCOs appear to be unwilling to provide the necessary product pricing details as to how those "market based rates" are derived to mass market customers in a manner that is transparent so as to enable an open and competitive marketplace where customers can participate fairly and with the necessary knowledge to make rational and fully informed decisions on whether it is in their best interest to take commodity service from their default utility, or from a particular ESCO among competing but equally opaque choices.[69]

138. As for the ESCOs' claim that their marketing and overhead costs explain the overcharges, NYPSC staff found that these costs do "not justify the significant overcharges" ESCOs levied.[70]

139. Similarly, the NYPSC staff found that the "claim that at least a portion of the significant delta between ESCO and utility charges is explained by ESCOs offering renewable energy is disingenuous at best. ESCOs may be charging a premium for green energy, but they are not actually providing a significant amount of added renewable energy to customers in New York."[71]

140. Instead, NYPSC staff reached the following conclusion:

> The massive $1.3 billion in overcharges is the result of higher, and more often than not, significantly higher, commodity costs imposed by the ESCOs on unsuspecting residential and other mass market customers. These Overcharges are simply due to (1) the lack of transparency and greed in the market, which prevents customers from making rational economic choices based on facts rather than the promises of the ESCO representative, and (2) obvious efforts by the ESCOs to prevent, or at least limit, the transparency of the market. These obvious efforts include the lack of a definition for

[69] *Id.* at 86 (citations omitted).

[70] *Id.* at 37.

[71] *Id.* at 69.

> "market rate" in their contracts, resulting in the fattening of ESCOs' retained earnings.[72]

141. Thereafter, the NYPSC found that ESCOs' overcharging is completely unjustified and faulted ESCOs for concealing critical pricing data from both ordinary consumers ***and the NYPSC itself***: "without transparent or unbundled pricing data, neither the Commission nor ESCO customers can evaluate whether the prices being charged by ESCOs are just and reasonable."[73]

142. The NYPSC then proceeded to "reject all arguments that customers will be better off in a retail market that permits opaque and confusing ESCO pricing/billing to continue"[74] and required that ESCO bills show how much the consumer's utility would have charged.[75]

143. In addition, and in response to the mounting evidence of ESCOs' improper pricing practices, on September 20, 2023, New York Governor Kathy Hochul signed new legislation (A.703-A/S.683-A) to eliminate "surprise price increases" by requiring that ESCOs obtain express consent from customers prior to increasing prices.[76] The legislation was introduced after reports that ESCOs in New York, like CleanChoice, charge some of the highest residential energy costs in the United States.[77]

---

[72] *Id.*

[73] CASE 12-M-0476, Order Adopting Changes to the Retail Access Energy Market and Establishing Further Process ("December 12 Order"), at 31, N.Y. Pub. Servs. Comm'n (Dec. 12, 2019), https://documents.dps.ny.gov/public/Common/ViewDoc.aspx?DocRefId={045F848D-2346-43F3-BD7D-D419077134C7}.

[74] *Id.* at 33.

[75] *Id.* at 33–34.

[76] Press Release, Governor Kathy Hochul, *Governor Hochul Signs Legislation to Protect Consumers from Surprise Price Increases in Energy Bills* (Sept. 20, 2023), https://www.governor.ny.gov/news/governor-hochul-signs-legislation-protect-consumers-surprise-price-increases-energy-bills.

[77] N.Y. State Assembly Sponsors Mem., Bill No. A703A, at 1 (2023).

144. New York is not the only state using the overwhelming evidence of consumer harm to take action to finally put an end to ESCOs' deceptive variable rate pricing practices. Oregon's electric utility restructuring law allows for sales of alternative electric supply only to commercial and industrial customers, not to residential customers. Connecticut has banned the sale of variable rate electricity, and on May 8, 2024, the Governor of Maryland signed a retail energy market reform bill that prohibits ESCOs from charging variable rates that "exceed the trailing 12-month average of the electric company's standard offer service rate in the electric company's service territory"[78]

145. In an effort to protect electricity consumers, the Massachusetts Office of the Attorney General passed a number of regulations against deceptive practices when selling electricity. *See generally* 940 C.M.R. § 19.04 ("It is an unfair or deceptive act or practice for a retail seller of electricity to make any material representation to the public or to any consumer, either directly or through any type of marketing or agreement, or through the use of any misleading symbol or representation, which the seller knows or should know has the capacity or tendency to deceive or mislead a reasonable consumer, or that has the effect of deceiving or misleading a reasonable consumer, in any material respect, including but not limited to representations relating to: (a) the quality, environmental . . . or source of any product or service being offered for sale by any retailer of electricity . . . . (d) any term of any agreement to be entered into by the retail seller of electricity and a consumer. (e) the distribution price, the generation price or the total delivered price of electricity or the price of any related electricity products or service to be charged to a consumer."); *see also* 940 C.M.R. §§ 19.05-19.06.

---

[78] *Maryland Gov. Signs Retail Market Reform Bill*, ENERGY CHOICE MATTERS, http://www.energychoicematters.com/stories/20240507z.html.

146. These regulations have unfortunately not prevented widespread overcharges by ESCOs like CleanChoice. "Regulation has not succeeded in changing the behavior of the industry" because "[m]any, if not most, third-party suppliers continue to aggressively resist transparency reforms and attempts by regulators to hold them accountable."[79] "Indeed, despite legal actions brought by the [Massachusetts Attorney General] against certain competitive suppliers and their marketers for deceptive marketing practices and increased regulatory scrutiny on individual residential suppliers in Massachusetts and elsewhere, the overall consumer loss continues unabated."[80] ESCOs "collectively refuse to acknowledge the problems" and "actively oppose attempts to make meaningful revisions to their underlying business practices that would help to transform this market into one that provides net benefits instead of net harm."[81]

## <u>CLASS ACTION ALLEGATIONS</u>

147. Plaintiff brings this action on her own behalf and additionally, pursuant to Rule 23(b)(2) and (3) of the Federal Rules of Civil Procedure, on behalf of a class of all CleanChoice customers in Massachusetts from the earliest allowable date through the date of judgment (the "Class").

148. As alleged throughout this Complaint, the Class claims all derive directly from a single course of conduct by Defendant. Defendant has engaged in uniform and standardized conduct toward the Class—its contract, billing, and marketing practices—and this case is about

---

[79] Campbell & Wu, n.12 *supra*.

[80] Susan M. Baldwin & Timothy E. Howington, *Consumers Continue to Lose Big: the 2023 Update to An Analysis of the Individual Residential Electric Supply Market in Massachusetts*, MASSACHUSETTS ATTORNEY GENERAL'S OFFICE, at 33 (May 2023), https://www.mass.gov/doc/consumers-continue-to-lose-big-the-2023-update-to-an-analysis-of-the-individual-residential-electric-supply-market-in-massachusetts/download.

[81] *Id.* at 33–34.

the responsibility of Defendant for its knowledge and conduct in deceiving and mistreating its customers. This conduct did not meaningfully differentiate among individual Class Members in its degree of care or candor, its actions or inactions, or in its misrepresentations or omissions. Upon information and belief, all of CleanChoice's Massachusetts customers (the "Class Members") were provided with CleanChoice documents that contained some or all of the representations and omissions that are the subject of this litigation.

149. Excluded from the Class are Defendant; any parent, subsidiary, or affiliate of Defendant; any entity in which Defendant has or had a controlling interest, or which Defendant otherwise controls or controlled; and any officer, director, employee, legal representative, predecessor, successor, or assignee of Defendant.

150. Plaintiff reserves the right, as might be necessary or appropriate, to modify or amend the definition of the Class and/or add additional Subclasses, when Plaintiff files her motion for class certification.

151. Plaintiff does not know the exact size of the Class since such information is in the exclusive control of CleanChoice. Plaintiff believes, however, that based on the publicly available data concerning Defendant's customers in the United States, the Class encompasses at least thousands of individuals whose identities can be readily ascertained from Defendant's records. Accordingly, the members of the Class are so numerous that joinder of all such persons is impracticable.

152. The Class is ascertainable because its members can be readily identified using data and information kept by Defendant in the usual course of business and within its control. Plaintiff anticipates providing appropriate notice to each Class Member in compliance with all applicable federal rules.

153. Plaintiff is also an adequate class representative. Her claims are typical of the claims of the Class and do not conflict with the interests of any other members of the Class. Plaintiff and the other members of the Class were subject to the same or similar conduct engineered by the Defendant. Further, Plaintiff and members of the Class sustained substantially the same injuries and damages arising out of Defendant's conduct.

154. Plaintiff will fairly and adequately protect the interests of all Class Members. Plaintiff has retained competent and experienced class action attorneys to represent their interests and those of the Class.

155. Questions of law and fact are common to the Class and predominate over any questions affecting only individual Class Members, and a class action will generate common answers to the questions below, which are apt to drive the resolution of this action:

a. Whether Defendant's misrepresentations and omissions are materially misleading;

b. Whether Defendant's conduct was deceptive;

c. Whether Defendant breached its contract with Plaintiff and Class Members by failing to set variable rates in the method dictated by the parties' contract;

d. Whether Defendant's conduct violates Mass. Gen. Laws Ch. 93A;

e. Whether Defendant was unjustly enriched as a result of its conduct;

f. Whether Defendant violated the duty of good faith and fair dealing in its consumer contracts;

g. Whether Class Members have been injured by Defendant's conduct;

h. Whether, and to what extent, equitable relief should be imposed on Defendant to prevent it from continuing its unlawful practices; and

i. The extent of class-wide injury and the measure of damages for those injuries.

156. A class action is necessary because i) the prosecution of separate actions by Class Members will create a risk of adjudications with respect to individual Class Members that will, as a practical matter, be dispositive of the interests of the other Class Members not parties to this action, or substantially impair or impede their ability to protect their interests; and ii) the prosecution of separate actions by Class Members will create a risk of inconsistent or varying adjudications with respect to individual Class Members, which will establish incompatible standards for Defendant's conduct.

157. A class action is appropriate because Defendant has acted or refused to act on grounds generally applicable to all Class Members.

158. A class action is superior to all other available methods for resolving this controversy because questions of law and fact common to the Class predominate over any questions affecting only individual Class Members and a class action will fairly and efficiently adjudicate the controversy.

159. Accordingly, this action satisfies the requirements set forth under Federal Rule of Civil Procedure 23(a) and 23(b).

## CAUSES OF ACTION

### COUNT I
### BREACH OF CONTRACT
### (On Behalf Of The Class)

160. Plaintiff realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

161. CleanChoice customers have form contracts with Defendant meaning their variable rate pricing terms are identical or substantially similar.

162. Plaintiff and the Class entered into valid contracts with Defendant for the provision of electricity.

163. CleanChoice represents to its Massachusetts customers that its variable rates for electricity are "based on market conditions and CleanChoice Energy's costs to provide energy supply service."

164. This contractual formula does not afford CleanChoice any rate-setting discretion whatsoever.

165. Upon information and belief, Plaintiff was subject to the same or materially similar contractual terms for her variable rate for electricity as CleanChoice's other customers in Massachusetts.

166. Pursuant to the contracts, Plaintiff and the Class paid the variable rates Defendant charged for electricity.

167. However, Defendant failed to perform its obligations under its contracts by charging rates based on factors that were not related to cost or market conditions.

168. Plaintiff and the Class were damaged as a result because they were billed, and they paid, a charge for electricity that was higher than it would have been had Defendant charged the rate required by its customer contract.

169. Every contract has an implied covenant of good faith and fair dealing in the performance and enforcement of the contract. The implied covenant is an independent duty and may be breached even if there is no breach of the contract's express terms.

170. Under the contract, to the extent Defendant had discretion to set the variable rate for electricity, it was obligated to exercise its discretion in good faith. Defendant exercised its discretion in bad faith. Specifically, Defendant acted with a bad motive and continued to gouge customers.

171. Plaintiff reasonably expected that CleanChoice's variable energy rates would not be continuously and significantly higher than its actual costs (taking into account market conditions) plus a commercially reasonable margin or than the utility's rates (even accounting for REC costs), which otherwise provide the same energy supply as CleanChoice. Without these reasonable expectations, Plaintiff and other Class Members would not have agreed to buy electricity from Defendant.

172. Plaintiff also reasonably expected that Defendant would refrain from price gouging. Without these reasonable expectations, Plaintiff and other Class Members would not have agreed to buy electricity from Defendant. Defendant knew it was engaging in price gouging and nevertheless extracted unreasonable and excessive margins from its variable rate customers.

173. Defendant breached the implied covenant of good faith and fair dealing by unreasonably exercising its rate-setting discretion to price gouge and frustrate Plaintiff's and other Class Members' reasonable expectations.

174. By reason of the foregoing, Defendant is liable to Plaintiff and other Class Members for the damages that they have suffered as a result of Defendant's actions, the amount of such damages to be determined at trial, plus attorneys' fees.

175. As a result of Defendant's breaches, CleanChoice is liable to Plaintiff and members of the Class for damages and attorneys' fees and expenses.

## COUNT II
## VIOLATION OF THE MASSACHUSETTS CONSUMER PROTECTION ACT, MASS. GEN. LAWS CH. 93A, §§1, ET SEQ.
## (On Behalf Of The Class)

176. Plaintiff realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

177. Plaintiff brings this claim under Mass. Gen. Laws Ch. 93A, §2 on her own behalf and on behalf of each member of the Class.

178. Massachusetts' consumer protection statute prohibits "deceptive acts or practices in the conduct of any trade or commerce." Mass. Gen. Laws Ch. 93A, §2. As described below, CleanChoice has acted deceptively in violation of Mass. Gen. Laws Ch. 93A, §2.

179. Because it engages in the "sale of a commodity for future delivery," Defendant is engaged in "commerce" under the definition established in Mass. Gen. Laws Ch. 93A, §1.

180. In addition, and independently, Mass. Gen. Laws Ch. 93A, § 2(c) provides that "[t]he attorney general may make rules and regulations interpreting the provisions of subsection 2(a) of this chapter," which in turn provides that "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful."

181. The Attorney General has issued such rules and regulations with respect to protecting consumers from retail electricity suppliers like CleanChoice. The regulations—940 C.M.R. § 19.00—are titled "Retail Marketing And Sale Of Electricity."

182. 940 C.M.R. § 19.01 provides: "The Attorney General promulgates 940 CMR 19.00 pursuant to the authority granted by M.G.L. c. 164, § 10:.C(a) and M.G.L. c. 93A, § 2 (c). Any violation of any provision of 940 CMR 19.00 shall be a violation of M.G.L. c. 93A, § 2(a)."

183. Defendant has engaged in, and continues to engage in, unfair methods of competition and unfair or deceptive acts or practices in violation of Mass. Gen. Laws Ch. 93A, §2, by violating numerous sections of 940 C.M.R. § 19.00.

184. 940 C.M.R. § 19.04 provides in relevant part that: "[i]t is an unfair or deceptive act or practice for a retail seller of electricity to make any material representation to the public or to any consumer, either directly or through any type of marketing or agreement, or through the use of any misleading symbol or representation, which the seller knows or should know has the capacity or tendency to deceive or mislead a reasonable consumer, or that has the effect of

deceiving or misleading a reasonable consumer, in any material respect, including but not limited to representations relating to:

> (a) the quality, environmental or other characteristics, or source of any product or service being offered for sale by any retail seller of electricity . . . .

185. CleanChoice violated this regulation—and Mass. Gen. Laws Ch. 93A, §2—by making the following material misrepresentations to consumers in the enrollment form and FAQs:

- Customers that switch to CleanChoice get "100% clean, pollution-free energy";
- "CleanChoice Energy will source wind and solar power from farms in your region;"
- By signing up with CleanChoice, customers would "obtain your electricity from renewable sources provided by CleanChoice Energy;"
- The electricity CleanChoice sells is "produced from wind and solar sources" that "do not produce carbon dioxide or contribute to air pollution"
- Enrolling with CleanChoice would result in consuming electricity from "clean, renewable sources;" and
- That after the switch "the electricity your home uses will be replenished by clean, renewable wind and solar sources supplied by CleanChoice."

186. The above misrepresentations were material.

187. CleanChoice knew or should have known that these statements had the capacity or tendency to deceive or mislead Plaintiff and Class Members.

188. The above statements had the effect of deceiving or misleading Plaintiff and Class Members.

189. 940 C.M.R. § 19.04 further provides: "It is an unfair or deceptive act or practice for a retail seller of electricity to make any material representation to the public or to any consumer, either directly or through any type of marketing or agreement, or through the use of any misleading

symbol or representation, which the seller knows or should know has the capacity or tendency to deceive or mislead a reasonable consumer, or that has the effect of deceiving or misleading a reasonable consumer, in any material respect, including but not limited to representations relating to: . . .

> (d) any term of any agreement to be entered into by the retail seller of electricity and a consumer.

190. 940 C.M.R. § 19.05(3) provides: "[e]xcept with respect to default generation service. . ., it is an unfair or deceptive act or practice for a retail seller of competitive generation service to initiate service to a consumer, or to provide any product or service to a consumer, or in any way obligate a consumer to accept or pay for any product or service, unless and until the retail seller of electricity has provided the consumer with the following information, in writing, in no less than ten point type for textual material and eight point type for footnotes, and in print that contrasts clearly with the material on which it is printed, and the consumer has affirmatively chosen the product or service: . . .

> (b) Complete, accurate pricing information, including materials demonstrating the relationship between usage levels or information specific to the consumer's actual electricity usage history; a definition and a complete explanation of each and every charge that the retail seller may bill to a consumer; an explanation of any applicable restriction, geographic or otherwise, on the actual availability of any price to a consumer; and the precise dates on which any offered price is available and ends, where appropriate."

191. 940 C.M.R. § 19.06 provides: "(3) Except with respect to default generation service, in which case information shall be provided in accordance with 220 CMR l 1.06(3) and (4), it is an unfair or deceptive act or practice for a retail seller of competitive generation service

to initiate service to a consumer, or to provide any product or service to a consumer, or in any way obligate a consumer to accept or pay for any product or service, unless and until the retail seller of electricity has provided the consumer with the following information, in writing, in no less than ten point type for textual material and eight point type for footnotes, and in print that contrasts clearly with the material on which it is printed, and the consumer has affirmatively chosen the product or service: . . .

> (b) Complete, accurate pricing information, including materials demonstrating the relationship between usage levels or information specific to the consumer's actual electricity usage history

192. CleanChoice violated 940 C.M.R. § 19.04(d), 940 C.M.R. § 19.05(3)(b), and 940 C.M.R. § 19.06(3)—and Mass. Gen. Laws Ch. 93A, §2—by making the statement in the Contract Summary that "[t]he introductory price for the first three months of service will be 12.40¢ per kWh. After that time, your price is subject to change monthly, based on market conditions and CleanChoice Energy's costs to provide energy supply service – your future monthly prices may be higher or lower than the introductory price," and the statement in Section 7 of the general terms that "[a]fter the end of the Initial Term, this Agreement will automatically renew on a month-to-month basis at a price per kWh that may vary monthly depending on market conditions."

193. As confirmed by the DPU NOPV, CleanChoice's Contract Summary form, and contract, conflicted with CleanChoice's actual business practice of raising prices regardless of market conditions and its energy costs. CleanChoice's contract summary forms and contract were inaccurate and deceptive.

194. The above misrepresentations were material because price is a primary factor that consumers consider when selecting electricity suppliers.

195. CleanChoice knew or should have known that its variable prices were not based on market conditions and that the above statements regarding the basis for variable prices had the capacity or tendency to deceive or mislead Plaintiff and members of the Class.

196. Additionally, and irrespective of CleanChoice's knowledge, the statements setting forth the basis for variable prices had the effect of deceiving or misleading Plaintiff and Class Members.

197. 940 C.M.R. § 19.05(1) provides: "[i]t is an unfair or deceptive act or practice for a retail seller of electricity to fail to disclose material information about its products, services, or business, where such failure has the capacity or tendency to deceive or mislead a reasonable consumer, or has the effect of deceiving or misleading such a consumer, in any material respect.

198. 940 C.M.R. § 19.05(2) provides that "It is an unfair or deceptive act or practice for a retail seller of electricity to fail to disclose to a consumer any material fact the disclosure of which may have influenced a reasonable consumer not to enter into a transaction."

199. CleanChoice violated 940 C.M.R. §§ 19.05(1) and 19.05(2)—and Mass. Gen. Laws Ch. 93A, §2—by failing to adequately disclose:

a. that its variable energy rates are consistently and significantly higher than the rates charged by the customer's existing utility charges;[82]

b. that customers paying Defendant's variable energy rates receive no material added benefit in exchange for paying energy rates that are dramatically higher than the local utility's rates, other than the minimal cost of additional RECs;

c. the true methodology Defendant used to calculate its rates;[83]

---

[82] *See Weinberg v. CleanChoice Energy, Inc.*, No. 23-CV-09685 (PMH), 2024 WL 3446515, at *10 (S.D.N.Y. July 17, 2024) (sustaining New York customer's consumer protection claim against CleanChoice based on this material omission).

[83] *See id* (same).

d. the conditions that must be present for a variable rate customer to save money compared to what the consumer's local utility would have charged;[84]

e. its costs to purchase RECs are minimal compared to its electricity procurement costs and that REC costs do not justify Defendant charging rates that are dramatically higher than the local utility's rates; [85]

f. its Use of a "glide path" practice to lull customers into not noticing that CleanChoice was engaging in price gouging by charging a rate based on a commercially unreasonable margin;

200. Failure to disclose each of the above items was an omission of material information about CleanChoice's products. These omissions (individual and together) had the capacity or tendency to deceive Plaintiff and Class Members regarding CleanChoice's variable rates, benefits, conditions for saving, CleanChoice's costs, and the effect of renewal on the variable-rate plan. These omissions, in fact, had the effect of deceiving and misleading Plaintiff and members of the Class about CleanChoice's variable rates, benefits, conditions for saving, CleanChoice's costs, and the effect of renewal on the variable-rate plan.

201. Moreover, the above omissions of material facts influenced Plaintiff and members of the Class to sign up for CleanChoice's service. Had CleanChoice disclosed these material facts, Plaintiff and members of the Class would not have signed up for CleanChoice's service.

202. Additionally, CleanChoice violated 940 C.M.R. §§ 19.05(1) and 19.05(2)—and Mass. Gen. Laws Ch. 93A, §2—by providing in its marketing materials the following frequently asked question and answer:

> **Q. What will happen to my electricity bills?**
>
> A. In short, supporting new renewable energy costs more than polluting energy. For most consumers, the biggest factor determining the size of their bill is the amount of electricity they use.

---

[84] *See id.* (same).

[85] *See id.* (same).

> Residential electricity use is typically higher in the winter and summer months when usage is almost always the biggest factor influencing electricity bills.

203. As confirmed by the DPU, the omission of price as a factor in "determining the size of their bill" in one of the marketing pieces implies that price is not significant. Yet, it is a primary factor for customers on CleanChoice's monthly variable price. CleanChoice's omission was inaccurate and deceptive. Stating that "the amount of electricity" customers use is the "biggest factor determining the size of the bill" had the capacity or tendency to deceive Plaintiff and Class Members regarding the importance of electricity prices as it relates to the size of the bill. This statement downplayed the importance of electricity price as a contributing factor to size of the customers' bill and had the effect of deceiving and misleading Plaintiff and members of the Class about the importance of electricity prices as it relates to the size of the bill.

204. In sum, CleanChoice violated, and continues to violate, various subsections of 940 C.M.R. §§ 19.04, 19.05, and 19.06 by misrepresenting the environmental characteristics and source of its electricity and by misrepresenting and omitting facts about its variable electricity rates, the importance of electricity price as it relates to the size of the bill, as well as by the other conduct challenged in this action.

205. Additionally, each of Defendant's contracts includes a three-day rescissionary period. During the rescissionary period, Defendant's contract serves as a solicitation because consumers may cancel the agreement before it becomes legally binding upon the expiration of the rescissionary period. Thus, during this three-day period, the contract are advertisements in which Defendant makes material misrepresentations about its variable rates.

206. Defendant knew or should have known that the conduct outlined above has the capacity or tendency to deceive or mislead a reasonable consumer, and that the conduct outlined above has the effect of deceiving or misleading a reasonable consumer in material respects.

207. The aforementioned acts are continuing, unconscionable, and deceptive and are contrary to the public policy of Massachusetts, which aims to protect consumers.

208. Defendant's false, deceptive, and misleading statements and omissions would have been material to any potential consumer's decision to continue to purchase electricity from CleanChoice.

209. Defendant knew at the time it signed up Plaintiff and prospective customers that a customer's primary alternative to CleanChoice was the customer's local utility.

210. Defendant knew at the time it signed up Plaintiff and prospective customers that CleanChoice's variable rates for electricity were consistently substantially higher than Plaintiff and prospective customer's local utility rate, a rate based on the utility's costs to provide energy supply service.

211. Defendant's omissions and misrepresentations about CleanChoice's variable rates for electricity were material to prospective customers.

212. Defendant's intentional concealments were designed to deceive current and prospective variable rate customers into believing that rates will be commensurate with the costs factors specified in CleanChoice's contract. By concealing its actual pricing strategy (artificially inflating prices and maximizing profits), Defendant deprived consumers from being able to make informed purchasing decisions.

213. Defendant's practices are unfair, unconscionable and outside the norm of reasonable business practices.

214. As a direct and proximate result of Defendant's unlawful deceptive acts and practices, Plaintiff and Class Members enrolled and remained with CleanChoice and suffered and continue to suffer an ascertainable loss of monies based on the difference in the rate they were

charged versus the rate they would have been charged had Defendant charged a rate based on the pricing formula set forth in CleanChoice's contract, as well as the difference in CleanChoice's variable rate and the default rate utilities charge, which is the rate Plaintiff and Class Members would have received had they not been deceived into accepting electricity supply from Defendant, and because they were not provided pollution-free energy, which is much more valuable than the brown electricity CleanChoice supplied. By reason of the foregoing, Defendant is liable to Plaintiff and Class Members for trebled compensatory damages, attorneys' fees, and the costs of this suit.

215. Plaintiff and the members of the Class further seek equitable relief against Defendant. Pursuant to Mass. Gen. Laws Ch. 93A, §11, this Court has the power to award such relief, including but not limited to, an order declaring Defendant's practices to be unlawful, an order enjoining Defendant from engaging in any further unlawful conduct, and an order directing Defendant to return to the Plaintiff and the Class all amounts wrongfully assessed and/or collected.

216. As a result of Defendant's deceptive acts or practices, Plaintiff and Class Members suffered actual damages in an amount to be determined at trial, and are entitled to their damages, costs, and reasonable attorneys' fees and all other relief available under Mass. Gen. Laws Ch. 93A, §2.

217. Pursuant to Mass. Gen. Laws Ch. 93A, §9(3), on July 31, 2025, and again on October 29, 2025, Plaintiff served Defendant's counsel with a written demand for relief, identifying the claimant and reasonably describing the unfair or deceptive act or practice relied upon and the injury suffered.

**COUNT III**
**UNJUST ENRICHMENT**
**(On Behalf Of The Class)**

218. Plaintiff re-alleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

219. This cause of action is pleaded in the alternative to Plaintiff's contract claims. To the extent the Court determines that a valid contract exists between the parties, Plaintiff does not intend to proceed with her unjust enrichment claim.

220. Plaintiff and the Class Members conferred a tangible economic benefit upon Defendant by contracting with Defendant for electricity. Plaintiff and the Class would not have contracted with Defendant for electricity had they known that Defendant would abuse the information asymmetry between it and its customers to charge excessive and exploitative rates.

221. Plaintiff and the Class Members would not have purchased energy from Defendant had they known the truth about Defendant's variable energy rates and the source of Defendant's electricity.

222. By engaging in the conduct described above, Defendant has unjustly enriched itself and received a benefit beyond what was contemplated by the parties at the expense of Plaintiff and Class Members.

223. It would be unjust and inequitable for Defendant to retain the payments Plaintiff and Class Members made for excessive energy charges.

224. Therefore, Defendant is liable to Plaintiff and Class Members for the damages that they have suffered as a result of Defendant's actions.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court:

(a) Issue an order certifying the Class defined above, appointing the Plaintiff as Class Representative, and designating the undersigned firms as Class Counsel;

(b) Find and declare that Defendant CleanChoice has committed the violations of law alleged herein;

(c) Render an award of compensatory and statutory damages, the precise amount of which is to be determined at trial;

(d) Issue an injunction or other appropriate equitable relief requiring Defendant to refrain from engaging in the deceptive practices alleged herein;

(e) Render an award of punitive and treble damages;

(f) Enter judgment including interest, reasonable attorneys' fees, costs, and expenses; and

(g) Grant all such other relief as the Court deems appropriate.

## JURY DEMAND

Under Federal Rule of Civil Procedure 38, Plaintiff demands that a jury determine any issue triable of right.

Dated: December 1, 2025
New York, New York

By: */s/D. Greg Blankinship*
D. Greg Blankinship BBO # 655430
**FINKELSTEIN, BLANKINSHIP, FREI-PEARSON & GARBER, LLP**
One North Broadway, Suite 900
White Plains, New York 10601
Telephone: (914) 298-3281
gblankinship@fbfglaw.com

J. Burkett McInturff*
**WITTELS MCINTURFF PALIKOVIC**
305 BROADWAY, 7TH FLOOR
NEW YORK, NEW YORK 10007
Telephone: (910) 476-7253
jbm@wittelslaw.com

*Attorneys for Plaintiff and the Proposed Class*

** Motion for pro hac vice admission forthcoming*